*4 Robbins.* Long Branch Comm'n *v.* Tintern Manor Water Co.

I will advise that the demurrer be overruled, with costs, and leave to the defendant to answer within twenty days after service upon him of a copy of the order and of payment of costs.

THE LONG BRANCH COMMISSION

*v.*

TINTERN MANOR WATER COMPANY.

[Submitted September, 1905. Decided November, 1905.]

1. Where a water company was organized to supply certain municipalities under *P. L. 1876 p. 318* (*Rev. 1877 p. 1365*), requiring the consent in writing of the corporate authorities proposed to be supplied, a municipality had power to impose terms as to the rates to be charged for both public and private consumption.

2. A municipality, independent of statute, has power and owes a duty to protect its inhabitants against extortion in the price charged for water supplied by a private corporation furnishing water to it for public and private consumption, and to compel the corporation to furnish water at reasonable rates.

3. In a suit to determine reasonable rates at which a water company should be compelled to furnish water to a city for public and private consumption, such rates should be established as will enable the water company to derive a fair income, based on the fair value of its property at the time it is being used by the public, taking into account the cost of maintenance and depreciation, current operating expenses, and the right of the public to have no more exacted than the service in itself is reasonably worth, including a fair income to the stockholders on their investment.

4. Rule for the establishment of reasonable rates to be charged by a water company for furnishing water to a city applied, and rates fixed for the various services performed.

On final hearing on bill, answer and proofs.

*Mr. Robert H. McCarter* and *Mr. Clarence G. Van Note,* for the complainant.

*Mr. William H. Corbin,* for the defendant.

PITNEY, V. C.

The municipal government of the borough of Long Branch (The Long Branch Commission), by its bill, filed July 31st, 1903, as originally framed, sought an injunction against the Tintern Manor Water Company, which for many years (under the name of the Long Branch Water-Supply Company) had been, and was still, supplying Long Branch and its inhabitants with water, to enjoin it from carrying out a threat recently made in writing, to discontinue its supply of water to the municipality for public purposes, unless the municipality should pay certain arrears of dues for water furnished it for about two years then last past.

On the return day of an order to show cause why such restraint should not be granted, it appeared that the contest arose out of a dispute as to the rates to be charged by the water company, not only to the municipality for public purposes, but also to private consumers.

In fact, it was practically a continuation, in another form, of the contest, instituted by a citizen, but in fact supported by the municipality, in the supreme court, of which a report is found in *Hicks* v. *Long Branch Commission, 69 N. J. Law (40 Vr.) 300.*

It further appeared that the dispute at the present moment (August, 1903) was not so much over the terms of the agreement which was defeated by the Hicks suit, and which was, as we shall see further on, sufficiently favorable to the municipality, as over the rates to private consumers which had been established by the water company on June 1st, 1903, and which were an amendment and slight reduction of rates established on June 1st, 1902.

At the argument on this order to show cause (August, 1903), the water company contended that the municipality had no right or power to interfere with the rates established by the water company for private consumers, or to make any terms for such consumers, and that the rates fixed by the water company, which was organized under the act of April 21st, 1876 (*P. L. 1876 p. 318; Rev. 1877 p. 1365*), were final under the thirteenth

section of that act, which declares that the company may sell its water at such price as the company may think proper.

But I held that the true construction of the last clause of the second section gave, by implication, authority to the municipality to impose terms upon the water company *in limine.* That section requires the nascent corporation to annex to its certificate of organization "the consent in writing of the corporate authorities" of any town or city proposed to be supplied "with water." And it has been held that the certificate of organization, without such consent, was null and void. See *Tyler* v. *Plainfield, 54 N. J. Law (25 Vr.) 526; Hampton* v. *Clinton Water and Water-Supply Co., 65 N. J. Law (36 Vr.) 158; Township of Franklin* v. *Nutley Water Co., 53 N. J. Eq. (8 Dick.) 601.*

This clause puts it in the power of the municipality to impose terms as to the rates to be charged to both the public and private consumers, and it has frequently been exercised. It was not, however, done in this case.

But, further, a statute permits the municipality to make contracts, such as that mentioned, for no longer than ten years, thus leaving it open to the municipality to revise its contracts with the water companies every decade. The result is, as it seems to me, that the municipality has the power, either by statute or by the implication therefrom, over the whole subject.

But, independent of such statutory provision, I think it is the province and the duty of the municipality, whenever opportunity offers, to exercise its power in the protection of its inhabitants against extortion, and to secure them a supply of water and of gas from corporations assuming to furnish those commodities at reasonable rates.

I so held, in *Public Service Corporation* v. *American Lighting Co., 67 N. J. Eq. 122,* and see *Davis* v. *Harrison, 46 N. J. Law (17 Vr.) 79* (at *p. 85*) ; *Lake* v. *Ocean City, 62 N. J. Law (33 Vr.) 160* (at *p. 162*), and *Carlstadt* v. *City Trust Co., 69 N. J. Law (40 Vr.) 44.*

The water company is exercising a public franchise, which, from its nature and mode of exercise, is necessarily, during its

continuance, a practical monopoly, and it follows, beyond all question, that its charges for its supply must be reasonable. And it would be strange, indeed, if the municipal government, which, so to speak, imposes this monopoly upon its citizens, were powerless to protect them against unreasonable charges.

However, the counsel for the defendant, at the hearing of the order to show cause, cheerfully acquiesced in my ruling, and it was at once agreed, in open court, that the bill should be amended by inserting a clause asking the determination by this court of the question of the reasonableness of the scale of charges demanded by the water company, as well those to the private consumers as those to the municipality. This amendment was made, and the bill, as amended, was answered and the jurisdiction of this court in the premises submitted to by defendant, and the cause brought to a final hearing, and a mass of testimony taken on the issue so raised in the spring and summer of 1904, and again in September, 1905.

In the meantime, an injunction against shutting off the water from the municipality was granted, on terms that it should forthwith pay to the defendant four-fifths of the arrears already accrued and of the dues thereafter to accrue pending the suit. The rate to private consumers to stand and be enforced according to the scale of June 1st, 1903, until the final decree of this court.

Coming, now, to the determination of the matters submitted, I find it necessary, for the full understanding of the affair, to give a short history of the water company which has been for years supplying Long Branch with water.

The defendant, the Tintern Manor Water Company, is the successor, by process of merger and consolidation (under sections 104-107 of the act concerning corporations of 1896; *P. L. 1896 p. 277*) of the Long Branch Water-Supply Company, which was organized in 1882, under the act of April 21st, 1876, *supra*.

The declared object of the latter company was to supply with water "the township of Ocean" (Monmouth county) "and the

seaside resorts of Long Branch, Monmouth Beach and Seabright, and the places adjoining thereto."

The only one of the places so mentioned then incorporated was Long Branch.

Attached to its articles of incorporation was the formal joint consent of the municipality of Long Branch and of Ocean township to the incorporation by the gentlemen mentioned in the certificate for the purpose above mentioned, and to the laying of water mains throughout the territory mentioned, and operating its works therein. The language of the consents is full and ample. No terms were imposed.

The territory of Ocean township covered by this certificate is about nine miles in length on the seashore, and varies in width from less than one-half a mile to upwards of two miles, being bounded on its northwest side, for about five miles, by the Shrewsbury river and Pleasure Bay.

At the southwesterly end, at Elberon and Deal, it extends several miles into the interior.

The Long Branch Commission covers about one-half of the southeasterly part of the ocean front of this tract.

This company proceeded to supply the territory mentioned, and took its supply from the Whale Pond brook, a stream rising in the interior and running at right angles to the coast, and emptying into the ocean in about the middle of the territory of the Long Branch Commission, and about a mile and a half southwest of the centre of the old village of Long Branch. The point of diversion is about a half mile from its *débouché* into the sea, and is called Takanassee.

It there established a pumping station and a water tower, about eighty feet high, and laid mains throughout Long Branch, and thence northeasterly along the beach to North Long Branch, Monmouth Beach, the old fisherman's village of Galilee, Lowmoor and Seabright, a distance of at least six miles. It also laid its mains southwest, to Elberon and South Elberon, as rapidly as population demanded.

In response to such demand it from time to time added more mains of greater size, and, apparently, always kept well up to,

if not in advance, of the demands of its patrons, and always served them, so far as appears, with entire satisfaction.

On September 21st, 1891, it entered into a written contract with the municipality of Long Branch, to continue for ten years. By that contract the municipality gave the water company the exclusive right to furnish water for municipal purposes, also the right to extend its mains through any of the streets of the municipality, and agreed to pay it $4,000 a year for the municipal supply, including street sprinkling and hydrant service, for hydrants then in use, with a further charge of $40 a year for each hydrant thereafter to be added.

The water company agreed to pay an annual tax, or whatever it may be called, of $250 a year, and to furnish at all times a complete and adequate supply of water.

The municipality further granted to the water company the exclusive privilege of furnishing water for private use to the residents of the community, upon condition that the rates charged for the use of water should not exceed the rates charged at the date of the contract, reserving the right to the water company to supply water to any premises, through a meter, at twenty cents per one thousand gallons (equal one hundred and thirty-three cubic feet).

In point of fact, there never was any scale of charges for unmeasured water established or enforced by the Long Branch Water Company until June 1st, 1902, and a great inequality and lack of uniformity arose out of the absence of such an established scale.

Very few, if any, meters were introduced, and none, I believe, for water used for ordinary domestic purposes.

So great was this inequality of charges that at and before the attempt to establish rates, on June 1st, 1902, in many instances private consumers were receiving, for $10 a year, a supply of water for which others were paying $40 per year. It was the attempt to adjust this inequality by raising the charges of those who had been served at a low rate which formed one of the causes of the previous and present contest.

In the meantime, in the latter part of the last century, the

growth of the population in the territory covered by the articles of association had grown from about six thousand, in 1880, including about four thousand for Long Branch, to over fourteen thousand, including about nine thousand for Long Branch, and the use of water had increased in a greater proportion.

Such greater proportion was due, as we all know, to the somewhat modern, lavish use of water for personal bathing, for lawn sprinkling and for street sprinkling.

The result was that the officers of the Long Branch Water-Supply Company found that in a very dry season their demand for several days was equal to the supply, and they took into consideration plans for increasing such supply.

Now, this, I conceive it to be well settled, was their undoubted duty. It was so declared by Mr. Justice Van Syckel, speaking for the court of errors and appeals, in *Olmsted* v. *Proprietors of the Morris Aqueduct, 47 N. J. Law (18 Vr.) 311* (at *p. 329*).

A company which seeks and obtains a franchise to supply a certain territory with water for public and domestic uses is under a moral, and, in my judgment, a legal, obligation to furnish a supply which shall be equal to all emergencies which may be reasonably anticipated, including unusual drouths and unusual conflagrations, and to bear constantly in mind the prospective increase in population and a consequent increased demand for water. The evidence taken herein, in September, 1905, showed that the Takanassee supply in the immediately preceding summer was entirely inadequate, and fully justified the necessity for some action on the part of the defendant company.

The problem thus presented to the old company was not easy of solution. They could have built a reservoir to store the waters of Whale Pond brook above Takanassee, which would have prolonged their supply, according to Mr. Sherrerd, upon whose opinion I place great reliance, for about ten years. But the contour of the earth presented no favorable location for such a reservoir. It would consist mainly of very shallow water, which is not desirable for storage purposes, and Mr. Sherrerd's

approval of the plan I thought, and still think, was not very hearty.

Its cost would have been about $220,000, and at the end of ten years, and I think sooner, as the evidence indicated, an insufficiency would still have arisen.

But, in addition to all that, the supply at Takanassee was not central. It was six miles away from Seabright, the northeasterly end of the territory, and the mains already laid for that populous resort were already worked to their full capacity, after having been once more than duplicated. So that, properly to supply Seabright, would have required the laying of several miles of new mains.

Then, at the end of ten years, it was said that a supplemental supply could have been found by sinking, in Long Branch City, artesian wells a few hundred feet in depth to tap the now well-known layer of water-bearing gravel existing along the shore, precisely as predicted by Professor Cook many years ago, and from which several towns in Monmouth county derive their supply. But I am not able to say that I think this bed of water-bearing gravel, which seems to be a continuous one, has been so far tested or explored as to render it certain that its storage capacity will stand an unlimited draft upon it, for it must be borne in mind that it is a mere storage reservoir, receiving its supply of water from rain falling on an outcrop in Monmouth county some miles inland from the seashore, and its storage capacity is undoubtedly limited. It appears that it has been tapped by a private individual in the city of Long Branch and water drawn therefrom.

This, however, can hardly be considered as a complete test of the reliability of the storage at that point.

And if a plant had been established in the northerly part of Long Branch, depending upon this subterranean supply, it would have required, in order to make it available, the establishment and continuous maintenance of a complete additional pumping station, and would have required two pumping stations constantly in operation, thereby in some respects doubling the expense.

The officers of the old water company looked elsewhere and fixed upon Swimming river, which rises farther in the interior, has a watershed ten times larger than that of Whale Pond brook, and empties into the Navesink river, six miles northwest of Long Branch. They then united by articles of merger with a small water company which had been organized at Deal Beach, southwest of Long Branch, and was in successful operation; a small one at Seabright, and two or three others which had only a paper existence, and with the Tintern Manor Water Company, then recently organized, and adopted the name of the latter.

Their pumping station is about one mile from Red Bank. From thence they laid a thirty-six-inch main through Little Silver and Oceanport, about eight miles to the westerly suburbs of Long Branch, and there connected with a small six-inch main of the old Long Branch system.

This connection was merely temporary and quite insufficient to supply the town without the aid of the Takanassee plant until the new system could be continued into the middle of the main town, there to connect with the large mains of that system.

Besides this, from the thirty-six-inch main at Little Silver, they laid a sixteen-inch main along the south shore of the Navesink river, through Fair Haven, Oceanic, then across Rumson Neck and the Shrewsbury river to Seabright, there connecting with the northerly end of the old Long Branch system.

This last connection was an important one, in that it enabled the company to fulfill its implied contract to supply Seabright and the other shore towns between it and Long Branch, and at the same time to reach with its flow the northerly part of Long Branch.

At the time the bill was filed, and at the hearing, the two plants, Takanassee and Swimming river, were still in use, but the plan of the defendant was, and is, to abandon Takanassee as soon as it shall have laid in the town of Long Branch the proper mains to enable it to do so from the Swimming river alone.

It is admitted that the new works are supposed to be amply sufficient, both as respects the supply of water and the size of the principal mains, to supply the region within its reach for fifty years to come.

Indeed, the size and costliness of the plant is a matter of complaint by the complainant, and it insists that it should not be called upon or required to pay rates for water sufficient to pay a fair return for so great an expenditure.

There is a measure of soundness and justice in this contention. The inhabitants of the borough of Long Branch ought not to be compelled to pay water rates adjusted to pay an income on a greater outlay in a plant than is reasonably needed for its supply. Just here I make the remark that the fact that the complainant is joined with the whole breadth of Ocean township, of which Long Branch covers only a part, is due to the fact that the municipal authorities of Long Branch voluntarily joined with those of Ocean township in a scheme which embraced both. But I suggest that it is highly probable that it will be found, in the end, that the whole territory can be supplied to a better advantage, as a whole, by one plant than it could be if broken up into parcels and supplied by several distinct plants.

I have said that a duty rested upon the old water-supply company to furnish and maintain a sufficient supply for the territory embraced in its articles of association so long as it appeared that the municipalities within that range relied upon it to furnish them with such supply. I think it follows that so long as those municipalities and their inhabitants tacitly acquiesced in being so supplied, it does not lie in their mouths to question the wisdom of the means adopted by the water company to fulfill its obligation in that behalf, provided the action of the latter is taken in good faith.

The selection of those means, so far as relates to the choosing the source of supply, is somewhat speculative at best.

In the present case there is no reason to doubt that the water company acted in good faith in deciding to abandon the Takan-

assee plant, even if they made a mistake in judgment in so doing.

I am unable to believe that the business men and capitalists who owned and controlled the Long Branch supply company deliberately abandoned, and, so to speak, threw away their pumping plant and property and rights of diversion at Takanassee, without being thoroughly satisfied that it was wise to do so.

But I do not think they did make a mistake in judgment; I do think that the evidence fully justifies them in their decision.

And here intervenes an important consideration. Any municipality, supplied with water under ten-year contracts and circumstances like the present, has the power, at the expiration of one of its contracts, to take measures to supply itself, either by erecting completely new water works or by taking, by condemnation, the whole or a part of those already in existence. They hold that power in reserve, both as a weapon of offence and defence against oppression by the existing water company. In the present case there is no reason for the belief, nor was it contended, that the contemplated change, which was in fact undertaken a few months prior to the expiration of the contract of 1891, was concealed from the authorities of Long Branch, and that they were taken by surprise in the premises.

In short, the complainant appears to have concluded, and wisely, as I think, to accept the situation, and to obtain the best terms it could from the water company for its future supply.

This explanation of the situation of the parties and their relative duties brings us to the consideration of the very matter submitted, viz.:

*First.* What annual compensation ought the defendant to have for the supply of water which it is giving, and agrees to continue to give, to the inhabitants of the territory covered by the Long Branch Commission?

*Second.* How shall that compensation be distributed between the municipality, as such, for public purposes, on the one hand, and the private consumers, on the other?

*Third.* As between the private consumers themselves?

The principle governing the first question is plain enough, but difficult of application to particular cases. It becomes complex as soon as an attempt is made to apply it.

The subject has received careful consideration in two very recent cases—one of *Brymer* v. *Butler Water Co.* (1897), by the supreme court of Pennsylvania (*179 Pa. St. 231; 36 Atl. Rep. 249*), and later (1902) in *Kennebec Water District* v. *Waterville, 97 Me. 185; 54 Atl. Rep. 6.* In the former case the subject was brought under direct adjudication. In the latter it arose incidentally, but received most exhaustive consideration, and the result is sustained by a wealth of authority. In the Pennsylvania case, Mr. Justice Williams, speaking for the supreme court (at *p. 251 of 36 Atl. Rep.*), says:

"By what rule is the court to determine what is reasonable and what is oppressive? Ordinarily, that is a reasonable charge or system of charges which yields a fair return upon the investment. Fixed charges and the costs of maintenance and operation must first be provided for. Then the interests of the owners of the property are to be considered. They are entitled to a rate of return, if their property will earn it, not less than the legal rate of interest, and a system of charges that yields no more income than is fairly required to maintain the plant, pay fixed charges and operating expenses, provide a suitable sinking fund for the payment of debts and pay a fair profit to the owners of the property, cannot be said to be unreasonable.

"This whole subject was brought to the attention of the learned judge by a request that he should find, as matter of law, that the reasonableness of the charges must be determined with reference to the expenditure in obtaining the supply, and providing for a fund to maintain the plant in good order, and pay a fair profit upon the money invested by the owners, and that a rate which did no more than this was neither excessive nor unjust. This the learned judge refused to find, saying, in reply to the request: 'We have no authority for such a ruling, and it would be unjust to the consumer, who would have to pay full cost of the water, provide a sinking fund, secure a reasonable

profit upon the investment, and have no voice in the management of the business of the company. The act of assembly in this regard can bear no such construction.' This ruling cannot be sustained.

"The cost of the water to the company includes a fair return to the persons who furnished the capital for the construction of the plant, in addition to an allowance annually of a sum sufficient to keep the plant in good repair, and to pay any fixed charges and operating expenses.

"A rate of water rents that enables the company to realize no more than this is reasonable and just. Some towns are so situated as to make the procurement of an ample supply of water comparatively inexpensive. Some are so situated as to make the work both difficult and expensive. What would be an extortionate charge in the first case might be the very least at which the water could be afforded in the other. The law was correctly stated in the defendant's request, and the court was in error in refusing it."

In the Maine case, which is largely relied upon by the counsel for the complainant herein, the following propositions were held:

"The basis of all calculation as to the reasonableness of rates to be charged by a public service corporation is the fair value of the property used by it for the convenience of the public.

"At the same time, the public have the right to demand that the rates shall be no higher than the services are worth to them, not in the aggregate, but as individuals.

"Summarized, these elemental principles are the right of the company to derive a fair income, based upon the fair value of the property at the time it is being used for the public, taking into account the cost of maintenance or depreciation and current operating expenses, and the right of the public to have no more exacted than the services in themselves are worth.

"The reasonableness of the rate may also be affected, for a time, by the degree of hazard to which the original enterprise was naturally subjected; that is, such hazard only as may have been justly contemplated by those who made the original in-

vestment, but not unforeseen or emergent risks. And such allowance may be made as is demanded by an ample and fair public policy. If allowance be sought on account of this element, it would be permissible, at the same time, to inquire to what extent the company has already received income at rates in excess of what would otherwise be reasonable, and thus has already received compensation for this hazard.

"In determining the present value of the company's plant, the actual construction cost thereof, with proper allowances for depreciation, is legal and competent evidence, but it is not conclusive or controlling.

"The request that 'under no circumstances can the value of the plant be held to exceed the cost of producing, at the present time, a plant of equal capacity and modern design,' should not be given. Among other things, it leaves out of account the fact that it is the plant of a going concern, and seeks to substitute one of the elements of value for the measure of value itself."

These propositions are sustained by elaborate reasoning and abundant authority. I do not think it worth while to cite the latter.

The supplying company is, as we have seen, under obligation to keep in advance of the present demand and take liberal account of the probable increase of demand due to increase of population. I think the language of Mr. Justice Dixon, in *Slingerland* v. *Newark, 54 N. J. Law (25 Vr.) 62 (at p. 69)*, is apt on this point: "It would, of course, be absurd for the city to construct water works adequate only for its present wants, and the prosecutor does not assert that the works now contemplated are unreasonably large in view of the city's prospective growth."

This is in strict accord with what was said (and above referred to) by Mr. Justice Van Syckel, in *Olmsted* v. *Proprietors of the Morris Aqueduct, 47 N. J. Law (18 Vr.) 329*, as follows: "In a matter of such extreme necessity all contingencies must be provided for, and the supply should be so ample that a lack of water could not be reasonably apprehended." To the same

effect are the more extended remarks of Judge Parker in the supreme court, in the same case, reported in *46 N. J. Law* (*17 Vr.*) *500.*   The learned judges, in these cases, were discussing the question of necessity for the exercise of the eminent domain.

The argument from such premises to the present is *a fortiori.*

These considerations lead to the conclusion that the water company, when it starts with new works, or a large addition to the original supply, is entitled to an income therefrom somewhat greater than what is due to the cost of work sufficient merely to meet the present demands.   I say "somewhat greater," for I do not mean to be understood as holding that capitalists ought to expect an immediate compensatory income from an enterprise of this character.   But, on the other hand, it would be manifestly unjust to expect them to invest their money in a plant necessarily larger than present demands require and take as an income therefor such a sum as would satisfy an investment sufficient to meet present demands.

For here comes in again, with great force, the consideration previously mentioned, that the municipality cannot bind itself for more than ten years, and in fact need not bind itself at all for any period, and it holds in its hand the absolute power to oust the water company at any time it shall so choose and may exercise that power as soon as by the increase of population and demand the investment by the capitalists shall have become actually profitable.

This is one of the risks spoken of and provided for by the supreme court of Maine.

Now, let us inquire what is the cost or the fair value of the works of the defendant.

*First.* The Takanassee works.

They were put into the new corporation at $425,000, or, rather, $325,000, subject to a mortgage for $100,000 to secure outstanding bonds.   That included the plant at Takanassee and all the street mains, both within and without the limits of Long Branch.

It was said by Mr. Sherrerd that the mains within the limits of Long Branch, just before the date of the hearing (May, 1904), could be replaced at about $115,000, but I think that was a very

low estimate, even at the then very low price of pig iron, which, as we know, fluctuates largely. The mains, in fact, probably cost twice the sum mentioned. I think no estimate was made (none was given) on the value of the mains outside of the corporate limits of the commission. To the value of the mains is to be added the removal value of the pumping engines and the fixtures and apparatus at Takanassee, which was considerable.

Then, $71,000 was paid for the Deal water works.

This brings us to the cost of the new plant, in producing proof of which a large amount of time and space was occupied. They were commenced by a contracting company under specifications of the work given in detail, and were to be paid for in $1,200,000 in first mortgage bonds and divers shares of the capital stock of the par value of $100,000.

Difficulties were encountered in carrying out this contract according to its terms and the plans were changed. The result of this was that the contractors were not held to their bargain, but were paid in bonds and stock, according to the actual amount of their expenditures.

In order to ascertain those expenditures an inventory of the work done was taken, and the cost was ascertained by the vouchers and checks furnished by the contractors.

The reliability of this mode of ascertaining the cost was fiercely attacked by counsel for the complainant, but I think this attack was not founded in justice. It is true it was alleged, and I believe proven, that some of the persons who were interested in the construction company were also interested in the water company; but the committee of the water company who undertook to make up the cost of the new works were not interested in the contracting company, and they went about their work and carried it through in the usual mode that business men would adopt under such circumstances. Of course, it was easy enough to measure up the fifteen or more miles of water mains laid and ascertain the sizes and the prices paid for it and the cost of laying them, and so with the cost of the pumping engines, filter plant, so far as finished, and the great dam across the Swimming river.

Moreover, maps of all these works were laid before the court

by defendant, and complainant had an opportunity to put experts upon it and give estimates of its probable cost, but did not avail itself of the chance.

The committee to ascertain this cost consisted of ex-Senator Blodgett, who had been connected for some time with the old company; Mr. LaMonte, its engineer and superintendent, and Mr. Conant, who at that time was its secretary, and all of whom were watching the construction as it progressed.

They found that the contracting company had expended $936,-000, and large sums were afterwards expended, and more yet have still to be expended, so that its cost may be fairly stated at $1,000,000.

The contractors, however, paid for all their work in cash.

The defendant estimates the cost, including the Takanassee and Deal works, at $1,500,000 and upwards, without counting the shares of stock which were issued, and which may be here treated as a mere bonus.

Several distinct criticisms and objections are made to the details given of this valuation. First, it is said that the cost of the site for the reservoir, amounting to $76,000, is too great. The land itself, consisting of several hundred acres, cost $40,000, and the cost of clearing $35,500.

In fact, only about one-third or one-half of this land has been, so far, covered with water, and much more than the amount covered has been cleared.

The fact is that the original plan provided for a very large reservoir, including a very high dam, but in carrying it out a lower dam and smaller reservoir were adopted.

It is admitted that the present supply is ample for many years to come. I shall deduct from the total $25,000 on this account.

The next item criticised is the cost of the dam itself, the total cost of which was $89,500.

The objection to this is that it was laid out and erected to its present height of a width sufficient for a dam two or three times as high, and that such construction cost nearly or quite twice as much as it would have done for a dam of its present height. I think this objection is well taken, but not to the extent claimed

by complainant. I shall deduct $30,000 on account of the excessive cost of the dam.

The next objection is to the size of the principal main laid, viz., about forty-two thousand feet of thirty-six-inch main, which was much too large and expensive, and that complainant ought not to be charged with an income on so great an outlay. Defendant admits that its plans were adapted to a future estimated growth of fifty years.

Mr. Sherrerd says, and I agree with him, that fifty years is too long for a forecast. He fixed thirty years as the usual limit. Now, it is readily perceived that the difference in cost between a thirty-six-inch main and a twenty-four or thirty-inch main is or may be so great that if it be saved and invested it will, with the accrued interest, in a period of thirty years, reach a sum sufficient to lay an additional main if the first shall at that time prove to be insufficient.

I have estimated by the use of standard hydraulic tables the difference in the cost and carrying capacities of a thirty-inch main and a thirty-six-inch main. These items vary according to the squares of the diameters of the respective mains. The square of thirty-six is one thousand two hundred and ninety-six, and the square of thirty is nine hundred. The proportion, then, in round figures, is as thirteen to nine. Applying that in practice, I find that the tables give the carrying capacity of a thirty-six-inch main, with a head of one foot in one thousand feet length, to be fifteen million gallons in twenty-four hours, and the carrying capacity of a thirty-inch pipe, under the same head, is nine million five hundred thousand gallons.

Now, taking the summer population of Long Branch at fifty thousand (which is double what it actually is, as we shall see directly), and estimating its daily consumption, including street sprinkling, at seventy-five gallons per head (which, in my individual judgment, is fifty per cent. more than it ought to use), we have three million seven hundred and fifty thousand gallons per day.

But, supposing that consumption is confined (which, however, it is not) to twelve hours a day, and call the rate seven million five hundred thousand gallons a day, and add to that for ten

fire streams a rate of three million gallons a day, and we have a total maximum demand of ten million five hundred thousand gallons to be supplied through thirty-three thousand feet of thirty-inch main, intervening between the Newman Springs pump and the city.  Now, the tables show that a thirty-inch main, thirty-two thousand or thirty-three thousand feet long, will deliver water at the rate of ten million five hundred thousand gallons per day under a friction head of thirty-five feet or fifteen pounds to a square inch, which, as we all know, is a trifling pressure.  If we add to this forty pounds to the square inch as a proper pressure to be maintained at the hydrants, we have a pressure at the pump of only fifty-five pounds to the square inch, which is also a very moderate water piston pressure for a steam pump.

The evidence is that the pressure at the works is maintained at sixty pounds to the square inch as a normal condition, and the works are arranged so as to maintain a pressure of eighty-five pounds to the square inch.

By increasing the pressure at the water piston of the pump, we can easily and readily increase the carrying capacity to twenty million gallons in twenty-four hours, and this can be done without improperly increasing the pressure on the steam piston by increasing the size of the steam piston as compared with that of the water piston.  This is the familiar mode of arranging pumps to raise water to high altitudes—one or two or three thousand feet.

Here it is to be observed that while the old system limited the amount of pressure to the amount of head in the standpipe, the new system inaugurated at Newman Springs is not so limited.

It is, in fact, the Holly system, which operates without a standpipe, in which a constant pressure is maintained automatically.

That the estimate on a ten and one-half million gallons supply is liberal, appears when we consider that the largest amount ever pumped in one day, up to and including the year 1903, was five million four hundred thousand gallons, measured by the strokes of the pumps, from which must be deducted the "slip," estimated by Mr. Sherrerd at ten per cent.  This was

for the whole system, including Seabright and the other smaller towns.

I conclude, then, that a thirty-inch main from the dam to the pumping station (nearly two miles), and from thence to the town (over six miles), is ample, flanked, as it is, by an eighteen-inch main from Little Silver to Seabright, each of these aiding the other in the case of an emergency of fire.

Besides, I am entirely satisfied that the estimate for seventy-five gallons per head per day would be reduced below fifty gallons per day by the general introduction of meters, and such reduction of consumption, or rather of waste, will result in the saving of fuel for making steam. This, I think, it is the clear duty of the defendant to accomplish as soon as practicable.

By the use of the same hydraulic tables showing the relative weights of thirty and thirty-six-inch mains and the difference in weight in lead used in joining the same, I conclude that the reduction of cost of the thirty-six-inch main laid, if a thirty-inch main had been used, would have been one-quarter.

The total cost of the eight miles of thirty-six-inch main, with the appliances, was $300,000. One-fourth of that would be $75,000, which I shall allow on that account.

The next objection is to the item of $110,800 of interest and $7,000 of coupons paid on bonds. It is argued that while an interest account in such cases is allowable, the above-stated amount is too great for these works, but I think that the amount of excess, if any, is too trifling to be taken into consideration in this connection.

The next objection is to the amount paid ($425,000) for the old works. No reliable statement was made as to what those works originally cost the old company. All that was said was that the present proprietors would not sell them for less than $325,000, besides the bonded debt. But, then, we must consider that there was not an actual sale for cash, but a merging into a new corporation. On the other hand, there was some actual loss in the abandonment of the old plant and the amount spent in and about the dam and pumping station at Takanassee. I estimate it at $100,000. I deduct, then, from the $1,500,000, as follows: Whole cost of works, $1,500,000; loss on Takanassee, $100,000;

overcost of thirty-six-inch main, $75,000; overcost of dam, $30,000; overcost on reservoir, $25,000; total loss, $230,000, leaving $1,270,000 as the amount upon which defendant ought to receive dividends.

The next question is, what proportion of that sum of $1,270,-000 ought to be charged, so to speak, to the defendant? The defendant suggests two-thirds. I heard from complainant no serious objections to this proportion. It accords with the present and recent proportion of consumption of water by the complainant as compared with the total consumption. This would require the complainant to pay a fair income on $847,000.

This seems a large sum of money, but let us see what the demands of Long Branch are at present and what they are likely to become in the future.

It has about seventy-three miles of streets laid out on paper and ready to be improved and built upon, and which, according to the evidence, are gradually coming into use.

Of these, only twenty-three miles are at present piped and supplied with water.

The population is steadily increasing by the building of country residences, villas and small boarding-houses, which latter are taking the place of the large caravansary hotels, which are going out of fashion *pari passu* with the destruction of the business of gambling.

The permanent population was nearly nine thousand five years ago, and is at this time probably ten thousand or more.

The summer population, which is also increasing, is variously estimated at from twenty-five to one hundred thousand. The higher estimate was put upon it by Dr. Reed, formerly mayor and a strong supporter of complainant in its present suit.

His evidence is this: "It is estimated that we have a population of between seventy-five and one hundred thousand in the summer." He says the permanent population of Monmouth Beach is probably three or four hundred in winter, and in summer possibly four or five thousand. He gives Seabright a permanent population of five hundred and in summer it is variously estimated at from twenty-five to thirty thousand. The same great variation probably applies to Deal.

Mr. Blodgett estimated the population of Long Branch in summer at from fifty to sixty thousand. By virtue of his position as president of one of the railroads controlling two distinct lines of transportation carrying persons to and from Long Branch, I should think his judgment more reliable than that of Dr. Reed.

Then we have the assessor of Long Branch, who estimates the summer population at twenty-five thousand.

His estimate is based upon observation of the capacity of the houses taken in making his assessment.

These are all mere guesses, not made up from any recorded observations or reliable data, unless Mr. Blodgett's may be so considered.

There is, however, a mode of reaching a safer conclusion, and that is by comparing the recorded consumption of water (as shown by the number of the strokes of the pumps) in the winter months with that in the summer.

Mr. LaMonte has furnished us with a table for the years 1891, and 1901, 1902 and 1903.

The lowest number of gallons pumped in any month in 1891 was fifteen million five hundred and two thousand seven hundred and sixty-nine, in January; the greatest was in the month of August—forty-nine million, nine hundred and eleven thousand four hundred and seventy-eight. The average per day, in January, was five hundred thousand; in July, one million six hundred and fifty-eight thousand six hundred and eighty-seven. This makes the consumption a little more than three times greater in summer than in winter. Whether the sewer system had then been introduced in the town has not been shown by the evidence, so far as I recollect. A sewer system in general use, as is now the case, undoubtedly has the effect of increasing the apparent consumption in winter, for the reason that people are liable to allow their faucets to run in cold weather to avoid freezing.

Coming, now, to ten years later—1901, 1902 and 1903—we find that in 1901 the smallest flow was in the month of January—forty million two hundred and fourteen thousand two hundred and sixty gallons—an average of one million

two hundred and ninety-seven thousand two hundred and thirty-four daily, and the greatest consumption was in August—one hundred and four million seven hundred and twenty-seven thousand nine hundred and forty-six—or a daily average of three million three hundred and seventy-eight thousand three hundred and twenty gallons, or a little more than two and one-half times that in January. In the year 1902 the smallest consumption was again in January—forty-two million sixty-three thousand five hundred and eighteen gallons—or a daily average of one million three hundred and fifty-six thousand eight hundred and eighty-seven gallons, and the greatest was in July—one hundred and four million seven hundred and sixteen thousand nine hundred and sixty gallons—a daily average of three million three hundred and seventy-seven thousand nine hundred and sixty-six gallons, almost precisely the same as in the month of August in the previous year, and a little more than two and one-half times the minimum amount in January.

In the year 1903 the smallest amount consumed was in the month of February—fifty-one million eight hundred and fifty gallons—or a daily average of one million eight hundred and twenty-one thousand four hundred and fifty-eight, and the greatest consumption was in July—one hundred and twenty-nine million ninety thousand four hundred and eight—or a daily average of four million one hundred and sixty-four thousand two hundred and six gallons. Here we have the summer flow just about two and one-half times the winter flow.

Applying that ratio here and counting the winter population of Long Branch at this time as ten thousand, we have the summer population, for the purposes of consumption of water, at least, at about twenty-six or twenty-seven thousand.

If this estimate be reliable, it greatly strengthens the conclusion at which I have arrived as to the capacity of a thirty-inch main to supply the whole district.

Now, in fixing the share of the whole cost to be charged to Long Branch, one other consideration comes in. The municipality has acquired the habit of using a very large amount of water in sprinkling its streets in the summer months. It uses

daily, in summer, except just after a rain, sixteen or seventeen sprinkling carts, which are going continuously, some of them early in the morning and late at night. Besides these are two or three maintained by the county on such streets as were improved by the county. These carts use an average of five hundred and fifty gallons at a load, and, except in case of rain, distribute from twenty-six to thirty-two loads each day. That will amount to nearly three hundred thousand gallons, or four thousand cubic feet, of water a day, enough to supply a population, for domestic purposes only, of six thousand persons.

Taking the population to be served with water during the summer months at thirty thousand, which, considering the amount used for sprinkling, is small enough, I think the estimate of the cost of the plant to be charged to Long Branch is none too great.

For it must be borne in mind that the size and capacity of the water works must be fitted to the highest population to be supplied, precisely as if that population were permanent and not fluctuating with the season.

I also think that water works costing $800,000 or more are none too great or costly for a town of that population.

The next question is, what is a fair income for the defendant to derive on that sum?

I have intimated that the defendant ought not to expect, at the start, a compensatory income such as that stated by Judge Williams in the supreme court of Pennsylvania, and by the supreme court of Maine, above cited, but I do think they ought to get at the start a moderate rate of interest, say five per cent., on their investment, after paying all expenses of operation and maintenance and a moderate allowance for depreciation in value.

This latter item, as applied to the water mains, is slight.

If originally laid of iron of proper quality and properly coated on the interior, they are practically immortal. They are, however, liable to diminution in carrying capacity, due to the growth on the interior of tubercles of rust. This is an unascertainable quantity, which varies materially with the

quality of the iron, the character of the coating and the characteristics of the water.

The fire hydrants, steam pumps, boilers and filters, and buildings, certainly do depreciate in value each year to an appreciable extent over and above the amount which may be expended upon them for reasonable and ordinary repairs. Mr. LaMonte put this depreciation at five per cent. on all the mains and hydrants. I think that too great and fix it at one per cent. on so much of the $847,000 as is represented by the material so subject to depreciation. Just what proportion of the whole that represents must be a mere estimate, with insufficient data. I put it at $600,000. /

It follows that the net income which the defendant ought to receive at the start from Long Branch should be five per cent. on $847,000, which amounts to $42,350, and one per cent. on $600,000, making $6,000, and a total of $48,350.

To this must be added the costs of maintenance and administration, including ordinary repairs and taxes. Mr. LaMonte had made up and submitted, and been cross-examined upon, a very careful estimate of those items, showing the amount to be $30,000. I have carefully scrutinized it and believe it to be a fair and just estimate.

Allotting two-thirds of this to Long Branch, we have it charged with $20,000 a year.

This seems a large sum, but it must be borne in mind that the works must, in their size and operation, be gauged to the highest population in the crowded season, and to the extravagant use in which Long Branch indulges for street sprinkling. Taking those matters into consideration, I do not find it oppressive.

The amount, then, which Long Branch should pay to the water company is as follows: Net income on investment, $46,000; add for expenses $20,000, and we have $66,000.

We come, now, to the proper division of this duty laid upon the municipality at large between what is called service for public purposes, fire hydrants and street sprinkling, and what is properly called private service enjoyed by the individual citizens.

An equal distribution of this burden is a difficult problem and one not capable of exact solution, and it may be stated thus: How much of the general cost of maintaining the water-supply should be assessed against the property owners, as other municipal taxes are assessed, without regard to the individual benefit by each therefrom, and how much should be distributed among the citizens according to the use each one makes of the water?

While probably incapable of solution with any degree of exactness, yet it is fortunate that a mistake in its solution is not serious, since it is quite certain that a good and reliable water-supply tends materially to promote the general prosperity of the municipality and increase the value of all land within its limits, whether or not it is served at present with water. Lands facing on the forty or fifty miles of unpiped streets in Long Branch are benefited to a greater or less extent by the bare existence of the water-supply and the certain availability of it for them in the future. The same remark applies with greater force to the vacant lots facing on the streets already piped.

I shall first consider the case of the municipal supply.

The contested contract of November 24th, 1902, framed after the schedule of rates to private consumers of June 1st, 1902, had been established and published by the water company, provides as follows: Twenty-five dollars per year for each hydrant then erected, or thereafter to be erected, and $100 a year for each wagon engaged in sprinkling the streets, with liberty to the municipality to put in use as many wagons over sixteen as it saw fit without further charge, and the water company to pay a franchise tax of at least $650 a year, which I feel sure is much less than the actual tax.

It also contained a provision that the rates for private consumers should not be increased during the ten years' period of the contract.

A new table of rates to private consumers was adopted, as we have seen, on June 1st, 1903, which, in some respects, reduces the rates of 1902.

This contract of November, 1902, never went into effect, and

at the hearing counsel for the complainant expressed his satis-
faction with it as to the municipal rates and asked the court
to adopt it. ·

This proposition was not acceded to by the counsel for the
water company. He declared that if the water rates to private
consumers established by the company, either those of June,
1902, or those of June, 1903, were to be disturbed and revised
by the court, he demanded that the rates of the unexecuted con-
tract of November, 1902, should also be revived.

In this I think the counsel for the defendant is entirely in
the right.

The offer, so to speak, of the water company, in the fall of
1902, to enter into the contract in question was based on the
condition that the scale of charges to private consumers of
June 1st, 1902, should stand unchallenged by the municipality.
The income which the water company expected to derive was
based upon estimates of income from the two sources combined.
I shall therefore disregard the terms of that contract, except so
far as they indicate what was in the minds of the parties at the
time.

First, the annual rent of fire hydrants.

There were, on May 1st, 1904, one hundred and forty-six
fire hydrants placed and in use, as I understand, being located at
intervals of an average of about one thousand feet.

I think a fair rental of these is $25 each. That is about the
average rental in the various municipalities whose rates were
proven before me. In Plainfield they are charged at $15 each,
but are placed much closer together, and are therefore much
more numerous in the same territory. This, in my judgment,
is a wise plan, and economical in the long run, since it enables
the firemen to reach a fire with a much shorter length of hose,
and thereby relieves the hose from the severe strain upon it
due to the pressure necessary to force a stream through a long
line of it.

If the fire hydrants in Long Branch were placed as close
together as in Plainfield, I should feel inclined to reduce the
rental.

At $25 each, the rental for those in Long Branch will

amount to $3,650 a year. This seems a large sum of money to pay, regardless of whether or not they are used for extinguishing fires. But the charge has a substantial foundation in reason.

In the first place, the water company comes under a serious obligation, somewhat like that of an insurance company, to keep itself in a continuous, uninterrupted and unfailing readiness to furnish at each fire hydrant a sufficient supply of water under a reasonable and adequate continuing pressure.

I stop here to say that some discussion arose at the hearing as to whether any decretal condition should be imposed upon the defendant as to the degree and extent of this pressure at the fire hydrants, and it was concluded, as I understood, that there was no occasion to impose any such condition, and it was remarked that there was no authority for any such action on the part of the court. To this I agree.

But I make this further remark—that the examination which I made into the carrying capacity of the thirty-six-inch main, the result of which I have already stated, satisfies me that there is no appreciable danger that there will ever be a deficiency of pressure at the hydrants.

As already remarked, the normal pressure at the pump is sixty pounds, and, under ordinary circumstances, with a thirty-six-inch main, that pressure will not be reduced at the fire hydrants to a degree which will impair their usefulness.

Moreover, the town very wisely has adopted and employs three very large steam fire engines, the successful operation of which will be affected very slightly, if at all, by a mere lack of back pressure at the fire hydrants, and these engines will always be well supplied if they find sufficient water in the main to fill them.

A failure in that respect will indicate a complete failure of the water company's whole system. Speaking as an amateur engineer, I should say that it would not be necessary, in a case of an alarm of fire, to even stop the sprinkling carts.

Another solid basis for the charge of hydrant rent is found in the fact that it is necessary for the water company, in order to maintain a sufficient flow at the fire hydrants, to install a

much larger general system of street piping than is necessary, or at all valuable, for the distribution of water for mere domestic supply. This I think they have done. The map indicates a range of sizes of mains much larger than would be required for mere domestic purposes. I find eight and six-inch mains laid where six and four-inch mains would have been quite sufficient but for the requisition for fire purposes. This surplus size must be continued in the future, and if the least defect in this respect is discovered it must be promptly remedied by gridironing with cross mains.

I fix $25 as a proper annual rental for fire hydrants, and the water company is to keep the same in repair, except when injured by external violence.

I come, now, to the item of street sprinkling.

This item is capable of more accurate treatment. The amount of water used is capable of approximate ascertainment, and the only question is, what rate shall be paid for it?

The capacity of the wagons in present use, it was agreed, would average five hundred and fifty gallons each. The number of runs each would make, in an ordinary day, when not stopped by rain or drizzly weather, was also ascertained with reasonable certainty.

Moreover, the amount distributed can be ascertained with absolute certainty by the introduction of a meter for each wagon. But I do not deem that exactness to be requisite, unless both parties agree to it. The principal and important matter is to settle the rate which the municipality should pay.

The evidence shows that the rates per one thousand gallons for metered water in different municipalities varies all the way from ten to thirty cents. The variation is due—*first,* to the general cost and value of the water at the point delivered; and *second,* to the quantity delivered at a single outlet.

The greatest variation in price is found in the quantity delivered, and that arises out of the difference between supplying goods at wholesale and retail.

The lowest rate I have heard mentioned is that for the water furnished by the city of Perth Amboy to the municipal authorities of South Amboy by a single branch leading from its

great main, through which it obtains its water from the south side of the Raritan river, and the water so taken by South Amboy is distributed to its citizens in the ordinary way. That rate is seven cents per one thousand gallons.

It will be perceived that the seller of the water incurs no expense whatever in the cost of distribution of the water or collecting the money for its proceeds.

I believe that it charges the same low rates for the very large quantities taken the year around by factories.

The other instances of rates running from seven to ten cents per thousand gallons are those of factories taking very large quantities steadily the year around.

I do not think that Long·Branch can put itself in the position of claiming rates on the basis of these year-around takers of very large quantities, for the simple and sufficient reason that Long Branch takes only in the summer time. For the other months of the year the great plant necessarily arranged for the highest consumption is for present purposes lying idle.

This last consideration is of the greatest importance, not only in this connection, but in others to be hereafter considered.

Mr. Sherrerd tells us that the sale by the city of Newark to the street sprinklers is based on a rate of fifteen cents per one thousand gallons, or at less rates on a sliding scale.

His evidence is not definite, but the actual charge is $6 per week for each wagon, which would be $26 a month.

I think, after a careful examination of the rates charged for measured water by other companies and cities, that those charged by the city of Perth Amboy to factories are the most reasonable and favorable to the complainant, and range from seven to twenty-five cents per. one thousand gallons. Applying that here, after making allowance for the circumstances that the sprinkling is practiced only in summer, and mainly in the three or four months when the supply from the springs and streams is the lowest, I think that eleven cents per one thousand gallons is sufficiently favorable to the complainant.

I make the average amount used by a sprinkling wagon in one month to be three hundred and seventy-two thousand gallons. In this I make no allowance for days on which sprink-

ling is omitted by reason of rain or mist, and I think no allowance on that account should be made, for the reason that the water company must make and keep up all its arrangements at the pumping station on a basis of the water being drawn every day, and it is doubtful if it will save during a rainy day any appreciable amount even in the quantity of fuel consumed.

Three hundred and seventy-two thousand gallons in one month, at eleven cents per one thousand gallons, makes $40.92. Counsel for defendant offered at the hearing to take $40 a month for each wagon, or to join the city in the expense of a meter put on each wagon at such a rate per one thousand gallons as the court should fix. I think this offer was reasonable and I shall adopt it. At that price, for four months, the amount which the city would pay for seventeen wagons would be about $2,720.

I say four months, as I interpret the evidence the full equipment of seventeen wagons is only maintained during four months in the midst of the season, and that for the one month on each side of the season a less number is used.

I estimate for those extra months the probable income, at that rate, will bring the total amount paid for sprinkling up to $3,400 a year. This makes the total paid by the city for the two items in question, viz., fire hydrants and sprinkling service, about $7,000 a year, which I think remarkably cheap.

We come, now, to the rates to be charged to private consumers. Here I must repeat what I said before, that the rates must be so arranged as that the defendant can have an income on a plant adapted to a population at its highest point in the course of twelve months.

The only saving by reason of a diminution of population in the winter months arises from a saving in fuel. The same attendants at the pumping station are necessary.

Then, again, the item of the cost of distribution intervenes, and that depends upon the compactness with which the town is built, which affects the length of main necessary to furnish the supply.

The complainant relied greatly upon several scales of charges

for water furnished by towns and small cities which own and operate their own works.

Here, again, a consideration of some importance intervenes, and that is the item of profit and of a provision for a sinking fund, referred to and approved in the authorities to which I have already referred. It is intended to cover the risk of such an enterprise.

A private capitalist who undertakes to supply a town with water sinks his money, so to speak, in the earth, in a shape that he cannot readily turn it into money, and he assumes the risk of the accuracy of his engineering and the durability of his works and the permanency of their need and the probability of their requiring at some time in the future a recasting and a rebuilding, either in whole or in part.

This latter is an experience which all the great public works of the last century have undergone.

Now, a municipality which erects its own public works assumes that risk, and, sooner or later, in all human probability, it will go through the same experience of being compelled to rebuild and renew.

The examples, in this respect, of the cities of New York and Newark are familiar to all.

However fortunate the small towns in Monmouth county, whose present success is put forward as examples by the complainant, may have been up to this time, there is no certainty that they will not be compelled in the future to abandon and lose forever a good share of the expense already incurred. Some, in fact, have already had that experience.

For these reasons, I cannot accept the rates of any of those as furnishing a proper estimate for the present case.

A municipality which permits a private company to undertake to supply it with water and gas must expect to appear, at least, to pay a little more for its supply than it might, at first, do if it undertook to furnish its own supply. Especially is this true when it is so fortunate as to have near at hand an abundant supply, which is easily appropriated by simple methods.

Then, if we compare the rates established by the defendant

with those established by private companies furnishing water to private consumers, we find a great variation in the mode of making up the items, so that a comparison in that respect is not easy. I speak now, of course, of charges for unmeasured water.

My own decided opinion is, as expressed at the hearing, that the fairest and most satisfactory mode of charging for water is by measuring it and fixing a price by the gallon or cubic foot.

But the defendant has made its scale of charges without measurement, and the system of charging by measuring has not become so general in its use as to warrant me in imposing it in this instance on the defendant, although I strongly recommend it.

The defendant makes two objections to selling its water by measuring.

*First.* The expense involved in immediately installing one thousand two hundred or one thousand five hundred meters, which, they assert, and I entirely agree with them, must fall on the water company, because it should own and control all the meters.

*Second.* That it would throw an unreasonable burden on the permanent residents by unduly favoring the summer residents, who would pay for only three or four months' supply. This last, I am decidedly of the opinion, can be overcome by charging a high rate, say, twenty-five or thirty cents a hundred cubic feet, for four or five summer months, and half that for the winter months.

Coming, now, to the rates they have established, and before examining them in detail I will notice the more serious objection to them, which is that the charge is precisely the same to those takers who use water for only three or four months and those who use it the year around. It seems to me that this rule of the company works the hardest against the large country houses, which are occupied, presumably, by persons who live in a style indicating that they can afford to pay high rates for water, and that it works in favor of the permanent resident, and this includes the majority of the citizens living in a more simple style. But the point is made by the municipality, which

may be supposed to have in view the interest of its permanent citizens, and it must be considered. Here, again, I must remark that the only difference that I can perceive which will be experienced by the defendant by the closing of the large country seats and villas for eight or nine months in the year is in the single item of fuel, and this can only be considerable if the defendant can dispense with one or two of its pumps and clean out the fires from one or two of its boilers.

But, nevertheless, I think some allowance should be made for non-use in the winter.

Here, again, a difficulty arises. The evidence tends to show that very few of the large country houses are entirely closed in the winter. A caretaker or housekeeper is frequently left in possession all winter. Then, again, many of the large boarding-houses are occupied by the proprietors in winter, but the guests' rooms are entirely vacant and the extra water-closets and bath-rooms are not used.

I think these difficulties can be overcome by an actual disconnection and cutting off of the fixtures not needed in the winter season, and by reducing the charge on fixtures so disconnected to, say, two-thirds of the regular rates for the length of time they are so disconnected. This will reduce the rates for the year on fixtures not used to about four-fifths of the rates charged for those used the year around. The expense of the disconnection and the reconnection in the fall and spring should be borne by the water-takers.

Coming, now, to the details of charges. It will be found quite difficult to compare it with those of other water companies, just as it is difficult to compare the charges of any other two companies.

Mr. Robert M. Kellogg, who is secretary and superintendent of the Middlesex Water Company, supplying several towns in that county, and of the Bergen Aqueduct Company, which supplies some towns in Bergen county, has adopted an ingenious mode of making a comparison. He collected and produced the rates of thirty-six towns and cities, mostly in New Jersey, and many of whom own their own supply, and then took as a standard a dwelling with the following water taps, viz., one

kitchen sink, with hot and cold·water; one water-closet, one bathtub, one washstand in bathroom and three laundry tubs.

He found the Long Branch charges for such a house to be $18.

He found eleven of the thirty-six to be the same. He found eight of the thirty-six to be more than $18. He found fourteen less than $18.

The highest was $25, in Flemington, New Jersey, and the lowest was $14, in Vineland, Lambertville and Rahway, New Jersey.

The average cost was $17.77. This result shows that I cannot interfere with the rates already established, except as hereinbefore provided, unless the result of their enforcement will produce more income than the defendant is entitled to.

There is a rate by meter for laundries, liveries and boarding-stables, at thirty-five cents per one thousand gallons, with a provision for an unmentioned lesser rate where the consumption is continued during the winter months. I cannot say that I think this is too high, provided a reasonable allowance is made for a large quantity used in the winter season.

Let us now inquire how these rates will work out in practice.

The income of the defendant from private takers within the limits of the Long Branch Commission for the years ending June 1st, 1903, 1904 and 1905, was as follows: 1903, $43,-707.34; 1904, $44,079.34; 1905, $45,510.15. If we add to the latter, for fire hydrants and street sprinkling, $7,000, and estimating for use by the county at $1,000, we have $53,510.15. Deduct from this the cost of administration, taxes, &c. ($20,000), we have $34,000 to be devoted to income and depreciation·of the plant, a sum which would make the income between three and four per cent. upon the amount I.have allotted to the Long Branch Commission.

I believe the above statement does not include the amount paid by the city for water in its public buildings. Add $500 for this item, we have a total of $54,000.

This sum is $11,000 less than I have found is a proper income for defendant to receive yearly from complainant for water service.

· If, instead of allowing defendant five per cent. on the $847,-

000 found to be complainant's share of the total cost of the works, we make it four per cent., free of taxation, the defendant will still be short $3,000 of paying that moderate income.

Or, to take another view, the defendant will receive between four and five per cent. from the cost of its works, without allowing anything for depreciation, except what is included in the estimate for repairs, forming part of Mr. LaMonte's estimate of annual cost of maintenance and administration.

But, then, another element comes in. If, under the conclusions I have arrived at, the water-takers are relieved of part of their annual payment by a deduction due to disconnecting fixtures in the winter time, the annual income will be somewhat reduced. Just how far, of course, is a mere estimate. But it is quite manifest that the defendant will not, under the rates which I have approved, receive anything more than a fair income on its property, even if the value of the works should be reduced considerably below the figure at which I have placed them. So that if I have erred against the municipality, I feel quite confident that that error has not gone so far as to injure it.

I believe I have now gone over all the questions submitted to me, and I shall close with one remark.

It is well nigh impossible to embody in a decree the rules and regulations and standard charges for the supply of water to a town, and it is quite impossible to so arrange them as to make the charges uniform and at the same time distribute them equally among the different private consumers. Much must necessarily be left to negotiations in particular cases.

Some towns, as shown by Mr. Kellogg, allow the amount of frontage of an establishment to affect the charge, and this, I think, is right, for reasons previously stated.

Then there is the element of vacant lots, and then when a new street is opened and partly built upon, the cost of laying the mains is precisely the same as if it were immediately closely built up, and that cost, of course, enters into the cost of supplying the pioneer builders on the street. These and other matters must be taken into consideration and dealt with in a spirit of accommodation and with a desire to treat all customers alike.

The water company should at all times bear in mind that they are exercising a public franchise, which it is to use, and not abuse.

And the municipality must bear in mind that the stockholders of the water company are entitled to a fair income on their investment.