The towns of Kearny and Harrison and the borough of East Newark for years past purchased their water supply from the New Jersey Suburban Water Company (associated with New York and New Jersey Water Company), which in turn obtained the supply from the Passaic Consolidated Water Company (East Jersey Water Company). The suburban company's plant consisted of a pipe line, manholes, gate valves, and meters at the three towns; also tools, that were seldom used; the annual outlay for labor was never *Page 369 
more than $1,200. Its thirty-inch pipe, more than two miles long, extends from the main of the consolidated at Belleville turnpike and Kearny avenue to the towns. Prior to March 27th, 1923, the suburban paid the consolidated $56.25, and the towns paid the suburban $82.50 per million gallons for the supply. The prices were fixed by contract. The Kearny and East Newark contracts had expired. On that date, and as of January 1st, 1923, the public utilities commission fixed the rate of $78 per million gallons for the supply of the consolidated to the suburban in lieu of the contract price, whereupon the suburban raised the price to the towns $26.25 and billed them at the rate of $104.25 per million gallons. The towns refused to pay. The suburban also refused to pay and litigated the new rate in the state courts and in the United States supreme court and was defeated. Refusing, the consolidated in May, 1925, threatened the suburban to turn off the water supply. Alarmed, the towns capitulated, appealed to this court, offering to pay a reasonable price and submitted themselves to the jurisdiction of the court to determine the rate, and thereupon an injunction pendente lite issued restraining the consolidated from carrying out its threat, and all parties were sent to the utilities commission to have the rate fixed, the towns in the meanwhile to pay the prevailing rate, $82.50. That body fixed a future rate of $99 per million gallons as of January 1st, 1929, against Harrison and East Newark and as of August 1st, 1928, against Kearny; holding that it had not jurisdiction to make the rate retroactive. No review of that rate has been sought, the parties abiding by it, apparently content. They agree that the testimony taken by the utility commission be used in presently determining the rate for the six years, 1923-1928, inclusive, supplemented by a bit taken here. Kearny and East Newark do not object to a $99 rate, as fair. But they resist the effort of the suburban to enhance it by a revision of the assessment of the utilities commission in respect to four items which it claims the commission either erroneously included or omitted from consideration. Otherwise, the suburban concedes that the rate fixed for the future *Page 370 
is a fair rate for the years involved. Harrison, disclaiming any interest in this phase of the case, rests on its contract rate, denying the court's jurisdiction to interfere with it.
The suburban claims that in appraising its property at $197,000 for rate making purpose the utilities commission allowed $20,000 for depreciation; that the proofs show no "observable depreciation" and that therefore the deduction of that amount from the cost of reproduction new was not warranted. McCardle
v. Indianapolis Water Co., 272 U.S. 400. The deduction is not without support of evidence, for the suburban tacitly acknowledge a depreciation by setting up in its books, a yearly depreciation, captioned "amortization," amounting in total to $80,000 and more. Two other objections are that in estimating operating expenses nothing was allowed for income tax, and an employe's annual wage was listed at $1,000 instead of $3,000 for one of the three years average operating expenses. The evidence is that the first item was and the others were not included in a tabulation prepared and submitted to the commission by one of its staff, not that they were not considered; and even if the former were inadmissible and the latter had been disregarded, it cannot be said that a mistreatment of one or more elements in the appraisal demands a revision or that it resulted in a finding which this court should not accept as its measure of the value of the past service. The commission's rate was not based upon a mathematically accurate and scientific formula of appraisement so that a revision is to be found in the simple method of addition or subtraction. But if we should for the moment take that course, and it is the attitude of the suburban, we at once find a countervailing item in that body's appraisement, in an annual allowance therein of $17,000 for amortization, upon the theory that in fifteen years thence hence the plant of the suburban will be obsolete for want of customers; it being the intention of the towns to eventually get their supply elsewhere. Clearly that item can have no place in a rate in which it plays no part. As to the supposed discrepancies for the past in the tabulation, they undoubtedly found compensation in the commission's ample *Page 371 
appraisement of the suburban's property and operating expenses. It had a wide leeway between the sum at which it assessed the value of the property and the high and low figure of expert witnesses — the range being from $83,000 to $256,000. And it is a permissible inference that the allowance for operating expenses was quite as generous. It is also fair to assume that the commission reasoned that if, as was the case, the suburban could under its former contracts differential of $26.25 pay sixteen per cent. dividend over a period of years, 1916-1922 (twenty-one per cent. in 1913), and in some of these years pay its officials for nominal services, salaries as high as $25,500, it could approximate a more nearly fair profit if the differential were modified to $21. Past profits may not be an element in rate making but they are not to be overlooked in the ascertainment. In view of the issue, confined as it is to the disputed items, the court is not called upon to analyze the commission's appraisement, nor to make an appraisal of its own, but if it were, it could, in the wide range of the experts' figures, and without much difficulty, reach a different result. The rate fixed by the commission is acceptable; as is the rate of return adopted by it of seven and one-half per cent. on the investment. The suburban urges that it should have an eight per cent. return, but without any showing for taking it out of the prevailing rate.
Harrison had a contract which expired in 1928, and in a suit at law quantum valebat more than the contract price, of course, could not be recovered. However, it appealed to equity, not to compel a performance of its contract nor standing on its legal right in that respect, but, after reciting the contract and setting up the $78 rate superimposed by the utilities commission upon the consolidated and suburban contract, and the passing along the increase to the town by the suburban's demand of $104.25 rate per million gallons, protested that it "has always been ready and willing to pay a fair and reasonable price for said water" and tendered itself "ready and willing to pay such amount as may be found to be due from it to the said water company," and submitted itself *Page 372 
to the determination by this court of the amount it should pay for the supply of water aforesaid," adding "that for such determination not only are the water companies [meaning the suburban and the New York and New Jersey Water Company] necessary parties but likewise the Passaic Consolidated Water Company;" and it prayed "that the court may settle and determine the amount to be paid by the complainant to the said New Jersey Suburban Water Company and the New York and New Jersey Water Company for water consumed by it, and may direct the complainant as to the manner of making such payment and may direct payment as that equity and justice will be done between all the parties." All of this was for the granting of the further prayer that the court would restrain the cutting off the water. Now, having, impliedly at least, offered to forego its contract rate and to do equity if equity would aid it, and the court having granted relief upon that assurance, how can the town repudiate its pledge and resist paying the rate the court has fixed as equitable and which its neighbors have accepted as equitable? Chancery has no rate-making power. That is a sovereign, not a judicial function, delegated to the public utilities commission. When, however, the sovereign-made rate proves oppressive to a public service in its relation with a co-operating public service and they, in a jurisdictional cause, submit themselves to an equitable adjustment, in the public interest, the court may fix the rate in determining the equities. Long Branch Comm. v. Tintern ManorWater Co., 70 N.J. Eq. 71; Collingswood S. Co. v. Collingswood,91 N.J. Law 20. When the town solicited the aid of the court there was a potential obligation, underlying its contract, to pay the suburban a reasonable rate for the public service as the sovereign, under which it holds its charter, may command.Hackensack Water Co. v. Board, c., of Comm'rs.,96 N.J. Law 184. And when the sovereign increased the rate to the suburban, it impliedly imposed it pari passu upon all users of the public service and the potential obligation ripened into a moral duty, falling short of a legal obligation only because the law does not spontaneously impress and apportion the burden upon and *Page 373 
among them, or because the machinery to that end had not been put in operation promptly. It was not until its supply of water was threatened that it acknowledged the gross inequity to the suburban, and then, to save itself, invoked the court's protection upon a solemn undertaking to relieve the situation as the court should find just, and by that it must stand. Had it not promised to abide by equity, equity would have declined its aid.
The matter will be referred to a master for an accounting. The accounting will include all money differences, if the pleadings create the issues.