COLLINGSWOOD SEWERAGE COMPANY, PROSECUTOR, v. BOROUGH OF COLLINGSWOOD ET AL., RESPONDENTS.

*Argued November 8, 1917—Decided February 7, 1918.*

1. Upon a petition by a public utility company to the board of public utility commissioners for permission to increase rates, the petitioner is entitled to a formal determination of the claim advanced by it that existing rates are unjust and unreasonable, and this right is not met by an adjudication that the rates are not so low as to be confiscatory.

2. By a consent given by a municipality to a sewerage company under the act of 1898 (*Pamph. L.*, p. 484; *Comp. Stat.*, p. 3584) maximum and minimum rates were fixed; subsequently the sewerage company petitioned the board of public utility commissioners for permission to increase rates. *Held*, that the board had power to increase rates.

3. An ordinance granting consent of a municipality to the incorporation of a sewerage company under the act of 1898 and fixing maximum and minimum rates is a grant upon condition rather than a contract; the legislature may clothe a public commission with power to fix higher rates upon petition by the sewerage company.

4. Rates charged by a public service company may be unjust and unreasonable because too low as well as because too high.

5. The board of public utility commissioners upon a petition by a sewerage company refused permission to raise rates, but found that the existing rates were not enough to enable the company to raise money to make necessary extensions, and suggested municipal action which would make it possible for the company to obtain new capital. *Held,* that the board should have ordered the necessary modification of rates and not have shifted the responsibility to the municipality.

On *certiorari* to board of public utility commissioners.

Before Justices SWAYZE, TRENCHARD and MINTURN.

For the prosecutor, *Gilbert Collins* and *J. Fithian Talem.*

For the borough of Collingswood, *John W. Wescott,* attorney-general, and *Francis D. Weaver.*

For the board of public utility commissioners, *L. Edward Herrmann* and *Frank H. Sommer.*

The opinion of the court was delivered by

SWAYZE, J. The prosecutor was incorporated in 1900, pursuant to the act of 1898. *Pamph. L., p.* 481; *Comp. Stat., p.* 3584.

In accordance with section 12 there was annexed to the ordinance granting the consent of the borough required by the act, the maximum prices or rents that might be charged property owners for the use of the sewerage system. There was also stated a minimum price which, though not required, was justified by the statutory authority to state other terms and conditions. Except for the maximum and minimum, no price was fixed. In 1914, the sewerage company petitioned the board of public utility commissioners for its authority to

charge higher rates. The board found that the present value of the plant after a proper allowance for depreciation was about $139,000; the gross income, $12,433.36; operating expenses, taxes and insurance, $7,226.52; and the net balance, $5,200, which it found furnished a revenue of more than three per cent. upon the company's property investment. Whether these figures make any allowance for depreciation does not appear. There is no finding as to whether the present rates are just and reasonable, sufficient or insufficient. The board contented itself with finding that it did not appear that the rates were so low as to be confiscatory. It found and stated in the beginning of its "report" that "it did not appear that the refusal to allow the increase of rates requested will result in the rendition of unsafe, inadequate or improper service to those *to whom the company is under obligation to serve with its present facilities.*" The importance of the limitation on the finding, indicated by the italicized words, is shown by a subsequent part of the report, where it is set forth that numerous applications were made to the board for orders requiring the sewerage company to make extensions of its service. As to these, the report finds that there is no doubt of the desirability of these extensions, but the board is unable to find that it is reasonable and practicable for the company in its present financial condition to make them. It, therefore, declines to order the extension, but suggests that the matter be given "serious consideration by the borough;" "it may be that relief can be had only by municipal action which will make it possible for the utility to obtain new capital."

That *certiorari* is a proper method to review such failure of the board to act as the act of 1911 contemplates, is now settled. The sewerage company was entitled to a formal determination of the claim advanced by it that existing rates are unjust and unreasonable. *City of Passaic* v. *Board of Public Utility Commissioners,* 87 *N. J. L.* 705. If the utility board had jurisdiction at all under the Public Utility act, this right was not met by an adjudication that the rates were not so low as to be confiscatory. The question of confiscation is important when the claim is made under the fourteenth

amendment that property has been taken without due process of law. The question under the Public Utility act is stated by the act itself. *Pamph. L.* 1911, *p.* 377, § 16c. The board is thereby required to fix "just and reasonable individual rates." The question is not whether existing rates are confiscatory but whether they are just and reasonable.

The first doubt to be resolved is whether the board had jurisdiction to settle this question. Its jurisdiction is challenged because it is said that to alter the rates would impair the obligation of the contract between the borough and the company. We think this question is settled, so far as this court is concerned, in favor of the jurisdiction of the board by what was said in at least three prior dscisions. *Public Service Railway Co.* v. *Public Utility Board,* 85 *N. J. L.* 123; *North Wildwood* v. *Public Utility Commissioners,* 88 *Id.* 81; *Atlantic Coast Railroad Co.* v. *Public Utility Board,* 89 *Id.* 407.

We might rest on these cases, but in view of the importance of the question, striking as it does at the root of a statute founding for good or ill a new public policy, we venture to add some additional considerations. In one sense, an ordinance embodying a municipal consent upon certain terms to a franchise, whether the general franchise to be a corporation or the special franchise to use the public streets, may be called a contract, accurately enough for practical purposes, since it constitutes an enforceable agreement. It is, however, ordinarily an agreement of a peculiar kind. The municipality as such, although a party, indeed often, as in this case, the only party on one side, has little or no direct beneficial interest. It contracts, or rather imposes conditions, for the benefit of individuals, as in this case, the borough, for the benefit of its citizens who might thereafter contract for connections with the sewerage system, provided for a maximum. But no citizen was bound to connect with the company's sewers, nor was there any express language requiring the company to supply the connection. There could not be any such requirement until the price was determined; the ordinance and consent did not fix a price but only the maximum and

minimum between which the price must fall. So far as the ordinance or consent goes, there might be within those limits a different price for each connection depending on its distance from a central point or a discharge point, on the size of the building, the number of toilets or water taps, or, perhaps, other considerations. In case of disagreement between landowner and sewerage company, the price would have to be fixed by some tribunal. It would not naturally be the other party to the agreement; it would properly be some outside tribunal, which might at least be supposed to be impartial. This might be a court, a commission, or, since 1911, the public utility commission. We know of no other way in which the individual rate could be fixed and a contract made for sewerage service. The legislature has in terms given that power to the public utility commission, and while the borough had power to impose fixed individual rates and a detailed schedule as a condition precedent to its consent, it chose not to exercise that power but to impose more elastic and less certain conditions.

Even if the ordinance had fixed the rate for each connection, there would have been no effective way for enforcing it as a contract by action, since the other contracting party is not injured and could only recover nominal damages. *Summit* v. *Morris Traction Co.*, 85 *N. J. L.* 193.

Regarding the ordinance solely as a contract, the individual citizens of Collingswood would have no right of action thereon because they are not parties to the agreement. *Hall* v. *Passaic Water Co.*, 83 *N. J. L.* 771 (at *p.* 776) ; *Baum* v. *Somerville Water Co.*, 84 *Id.* 611. The truth is an ordinance of this kind is a grant upon condition rather than a contract. It creates public duties which can be enforced by *mandamus*. *Rutherford* v. *Hudson River Traction Co.*, 73 *Id.* 227, 243. Whether upon a *mandamus* to compel a connection with a house sewer or drain, the court could fix the price somewhere between the maximum and minimum, is a question not now before us. The question now raised is whether the state through its legislative arm could provide a tribunal which might fix rates in the face of such an ordinance. Since some tribunal must

fix rates where the public utility corporation and the individual citizen cannot agree, and the rate is not fixed by ordinance, as it is not in the present case, we see no reason why the legislature may not clothe a public commission with that power, reserving, as the legislature has reserved in this case, the right of the Supreme Court to review by *certiorari.*

These considerations seem conclusive in favor of the general jurisdiction of the public utility commission, provided the language of the statute is apt for the purpose. It is obvious, from a mere reading of the act, that the legislature meant to invest the commission with full power, and that intent and the use of language apt for the purpose is not questioned. The point made is, that it is beyond the power of the legislature to impair the obligation of the contract between the municipality and the sewerage company by fixing a rate higher than the maximum fixed by the ordinance. This contention requires careful consideration. We have shown that the ordinance and consent of 1900 did not create a contract for actual service by the sewerage company to any customer, and that as to the municipality its effect was rather to create a public duty to be enforced by *mandamus* than a contractual relation to be enforced by action. Fixing limits between which the actual price of the service might be established by agreement, or otherwise, is rather in the nature of a legislative act to prevent extortion than of a contract. The ordinance was the legislative act of the municipality. As a legislative act, it was subject to the control of the legislature itself, and that body could make changes as long as it did not infringe the rights of the sewerage company, arising under the ordinance. It makes little difference whether we say that the ordinance created by way of legislative grant a property right called a franchise, protected by the fourteenth amendment, or a contract protected by the contract clause of the federal constitution and our own state constitution. In either case, the question is whether a municipal corporation, an agency of the state, is protected by either the fourteenth amendment or the contract clause. It is well settled that such protection does not extend to the rights of the municipal corporation against .

its own creator. . *Rader* v. *Southeasterly Road District, &c.,* 36 *N. J. L.* 273. The rule was there stated by Mr. Justice Depue:

"The power of the legislature over corporations created for purposes of local government is supreme. From a grant of this character, no contract arises with the corporators which exempts it from legislative control. The legislature may alter, modify or repeal the charter at any time in its discretion. The only limitation on the operation of such repeal is as to creditors, that it shall not operate to impair the obligation of existing contracts, or deprive them of any remedy for enforcing such contracts which existed when they were made."

This statement of the law has been frequently followed, has never been questioned in our state, and is supported by abundant authority in the United States Supreme Court. It is enough to cite *Worcester* v. *Street Railway Co.,* 196 *U. S.* 539.

The rule has been recently applied in Massachusetts to the case of increase of street railway fares. *Board of Survey* v. *Bay State Street Railway Co.,* 113 *N. E. Rep.* 273. It applies with all the more force to changes of the terms of municipal ordinances granting rights to public utility companies, so far as concerns the rights of the municipalities themselves, because of the fact that in fixing the terms, the municipal authorities do not act for the local interests of the municipality, but "as public officers exercising a *quasi*-judicial authority." *Hewett* v. *Inhabitants of Canton (Mass.),* 65 *Id.* 42. As to contracts for service that may have been made with individuals, we are not informed. There were such contracts, it appears, but we are not advised of their terms. They may all be terminable at the will of the sewerage company, and it is probable that they were merely contracts for service without any definite term being fixed. Whether for no definite term, for a definite term, or, nominally, in perpetuity, all were made subject to the power of the state to regulate rates. This is a governmental function and cannot be contracted away, even by a municipality, unless specifically authorized by the legislature; and the authority must be clear. *Home*

*Telephone Co. v. Los Angeles,* 211 *U. S.* 265. Much less can this governmental power be hampered without clear legislative authority, by a contract between a private corporation and private citizens. We do not know that it has ever been suggested that such a contract was not subject to legislative control. To hold that such a contract could tie the hands of the legislature would be to establish diversity in rates. Consumers, by favor, or by skill in bargaining might obtain advantageous rates, and would thwart the establishment of uniform rates to which so much of our legislation has been directed. The government has never granted this governmental power to private citizens, and, in the absence of such a grant, no contract can diminish the government's right of control.

We think, therefore, that the power of the legislature is untrammeled by any possible impairment of the obligations of contracts within the meaning of the federal or state constitutions.

It is equally untrammeled, so far as the rights of the municipality are concerned, by the fourteenth amendment. If the ordinance and consent of 1900 can be said with any propriety of language, to have created a property right in the municipality, that right was subject to legislative control. *Hunter v. Pittsburgh,* 207 *U. S.* 161, 178.

The next question is whether the Public Utilities act of 1911 authorized the commission to raise rates as well as to lower them. Of this there can be no doubt. The power is given by section 16c, which authorizes the commission after hearing upon notice by order in writing to fix just and reasonable individual rates, wherever an existing rate is unjust, unreasonable, insufficient or unjustly discriminatory or preferential.

It is too plain to require statement that a rate may be unjust and unreasonable because too low as well as because too high; the statute aims to secure justice to both sides. If the words "just and reasonable" were not enough, the inclusion of the case where the existing rate is *insufficient* would remove all doubt. Injustice and unreasonableness due to an insufficient rate can only be corrected by raising it, and injustice

due to discrimination or preference may require that one rate be raised or that the other rate be lowered in order to produce a rate that shall be just and reasonable. Only by adhering to the express language of section 16c can the result be reached that is set forth in section 15, that the board shall have general supervision and regulation of, jurisdiction and control over, all public utilities, and over their property, property rights, equipments, facilities and franchises, so far as necessary to carry out the provisions of the act.

These general considerations bring us to the order made in this particular case. The board failed to decide in express terms the question which the statute required them to decide —whether the rates were just and reasonable. Instead of deciding that question, they decided only that the rates were not confiscatory. In view of the decisions of the United States Supreme Court, we cannot understand how this result can be vindicated as a general proposition, but it is enough to say that the board was not authorized to pass on that question. Its duty was to determine what rates were just and reasonable; a rate might well be unjust and unreasonable although not confiscatory. We have said that the board failed to decide this question in express terms. It did, however, decide it by implication adversely to the municipality. It found that extensions of the system for which numerous applications had been made were desirable, but that it was not reasonable and practicable for the company in its present financial condition to make them. It, therefore, declined to order them and suggested municipal action which would make it possible for the company to obtain new capital. This amounted to turning over to the borough a duty which the statute imposes on the board. One of the objects meant to be secured was adequate and proper service for the public (not merely for those entitled to service with "present facilities") by order of the board, including reasonable extensions where they will permit sufficient business to justify construction and maintenance and when the financial condition of the public utility reasonably warrants the original expenditure required. The board, in effect, and by inference, finds that the present service is not

adequate, that extensions are reasonable and practicable and that the financial condition of the company could be made to justify the expenditures and that new capital could be obtained for the purpose if the municipality would consent to a modification of rates. If this view is correct, the board should have ordered the necessary modification of rates and not have shifted the responsibility to the municipality. What its findings may be when it considers the questions the statute calls upon it to solve, we cannot know. Its present order is not in accordance with the statute. It must therefore be set aside and the case remitted in order that there may be proper findings. No costs will be allowed.