27 N.J. 192 (1958)
142 A.2d 85
IN THE MATTER OF THE FORMAL COMPLAINT OF THE BOARD OF FIRE COMMISSIONERS OF FIRE DISTRICT NO. 3, TOWNSHIP OF PISCATAWAY, NEW JERSEY
v.
ELIZABETHTOWN WATER COMPANY, CONSOLIDATED.
ELIZABETHTOWN WATER COMPANY, CONSOLIDATED, APPELLANT,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, AND BOARD OF FIRE COMMISSIONERS OF FIRE DISTRICT NO. 3, TOWNSHIP OF PISCATAWAY, RESPONDENTS.
The Supreme Court of New Jersey.
Argued March 18, 1958.
Decided May 26, 1958.
*195 Mr. John R. Sailer argued the cause for appellant.
Mr. Howard T. Rosen argued the cause for respondent Board of Public Utility Commissioners, etc. (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney).
Mr. Sidney M. Schreiber argued the cause for New Jersey Natural Gas Company (Messrs. Schreiber, Lancaster & Demos, of counsel).
The opinion of the court was delivered by FRANCIS, J.
We certified this cause on our own motion to review the order of the Board of Public Utility Commissioners requiring appellant Elizabethtown Water Company to extend its facilities to supply water to the respondent Board of Fire Commissioners of Fire District No. 3, Township of Piscataway, and to certain residents of the area involved.
On February 2, 1905 the Piscataway Water Company was incorporated "for the purpose of constructing, maintaining and operating water works in the Township of Piscataway * * *, and for the purpose of supplying the said township and the inhabitants thereof with water * * *." *196 Attached to the certificate of incorporation was the necessary approval of the governing body of the township which recited that, pursuant to an authorizing ordinance, consent was given to the incorporators to form the company for the purposes stated.
The franchise thus created constituted a contract between the utility and the municipality, subject, of course, to the state regulatory power. Bourke v. Olcott Water Co., 84 Vt. 121, 78 A. 715, 33 L.R.A., N.S., 1015 (Sup. Ct. 1911); 23 Am. Jur., Franchises, §§ 6, 15, 35; 43 Am. Jur., Public Utilities and Services, § 16. The burden assumed thereby was a community service; it was not limited to the establishment of a system suitable only to the then current needs. Included also was the utility's duty to keep in view the probable growth of the township, both in population and in structural development, and to make gradual extensions of its mains to meet the reasonable demands that would inevitably result. Reid Development Corp. v. Parsippany-Troy Hills Tp., 10 N.J. 229, 234 (1952); Hackensack Water Co. v. Ruta, 3 N.J. 139, 147 (1949); Long Branch Commission v. Tintern Manor Water Co., 70 N.J. Eq. 71, 77 (Ch. 1905), affirmed 71 N.J. Eq. 790 (E. & A. 1907); 56 Am. Jur., Waterworks, § 60.
It is not suggested that since 1905 any utilities other than the Piscataway Water Company and the appellant as its successor have supplied water within the franchised limits of the township. The operation is as presently exclusive in fact as the one examined in In re Township of Lakewood, 29 N.J. Super. 422 (App. Div. 1954), rehearing denied sub nom. Lakewood Tp. v. Lakewood Water Co., 30 N.J. Super. 79 (App. Div. 1954). No contention is advanced here (nor was there in the Lakewood case) that the franchise is exclusive in law.
On November 27, 1922 the Piscataway Water Company became consolidated with the appellant Elizabethtown Water Company, and under the agreement the latter expressly assumed all of the obligations and duties of the former. Cf. 23 Am. Jur., supra, § 35.
*197 The township is divided into fire districts pursuant to N.J.S.A. 40:151-1 et seq. Each district is a separate corporate unit managed by commissioners, and each has specifically described geographical limits. The commissioners are given the power to provide means for protection against fires within the defined area, N.J.S.A. 40:151-1, 2; 40:151-27, including, of course, a supply of water with which to combat them. According to a statement appearing in the testimony, Piscataway presently pays over $22,000 annually to appellant for hydrant service.
The record indicates that for 22 years the commissioners of District No. 3 have been concerned about the absence of a water supply for fire fighting purposes in their area. But appellant has steadfastly refused to extend the mains unless the district would assume the original capital outlay. Over the years, the township has grown and the water facilities have been expanded proportionately. At the present time, service is provided for the "territory entirely surrounding" the section of District No. 3 which is involved in the application under consideration. The portion to be served by the proposed extension encompasses only a relatively few blocks. The map prepared by the company's chief engineer shows that the new mains, if laid according to the more extensive but only really adequate plan, would serve an area of 51 acres, interlaced with a few streets. The map indicates also that there are existing mains within a block or two blocks to the west and northwest and to the east of the suggested extensions. The situation to the south is not disclosed as the sketch covers only one block from the most southerly of the proposed new mains. However, the inference from the testimony already referred to is that the existing facilities are not far removed. In June 1956, when the water company's engineer visited the location in order to draw the map, there were 60 occupied homes in the area, and ample space remained for many more. Water is provided by wells which were dug by or for the individual owners. The engineer stated that "several new homes" had been constructed there in the year and a half between the filing of *198 the petition and the date of the hearings. In this connection, he testified further:
"Q. Well, in the period of time since you have become familiar with this particular territory, would you say that the construction and development in the area has increased since you first knew it? A. New construction of residences in central New Jersey is increasing greatly, and the area of Piscataway and Dunellen is growing  there are more new residences each year than there were the year before. It is in a period of growth."
According to the secretary of the fire district, these homes have no fire protection and "if anything should happen now, we would just lose the house, that's all." Speaking of the home owners, he said also:
"They have been after the fire commissioner, `Why isn't there water out there? Why can't we get water out there?' They have continually come to our meeting to find out why. What progress are we making? If the water was there these people building these homes would certainly be putting it in rather than digging a well,"
to which the company's engineer, who was then on the witness stand, replied:
"Well, we are in the business of selling water in there, but we have to sell it on the pattern which is established for the company."
The application for extension of the mains was filed with the Board on January 20, 1955. Some time prior thereto, a petition was presented to the fire commissioners signed by 36 home owners in the area, reciting that they
"hereby apply for city water in our area and the maximum number of fire hydrants allotted for fire protection of our property. Furthermore, the undersigned do agree to use the proposed water in their homes providing some water supply will be piped to our area without any cost to us, with the exception of having the water piped from the road into our homes which we understand will be at our own individual expense."
The record discloses that this document was filed with the Board of Public Utility Commissioners, although it was not *199 marked as an exhibit at the hearings. The decision of the Board notes the application of these residents as one of the factors inducing the extension order. It would have been more satisfactory from a procedural standpoint to have had these persons formally join in the petition of the fire district. Our affirmance of the order, as hereafter set forth, is made dependent upon such joinder.
The matter was assigned for hearing to an examiner, who took the testimony of the parties on two separate occasions.
The uncontradicted proof offered by the company shows that the cost of extending the mains to accomplish the plan declared by the examiner to be the only one which would provide worthwhile fire protection service would be $34,570. The engineer testified also that the estimated immediate annual revenue from the fire district and the 36 users would be $1,600, and that, considering the portion of the operating costs of the company properly allocable to this extension, an annual loss of $1,425 thereon would result. However, it is not suggested that such loss cannot be absorbed in the overall revenue without any appreciable effect upon the reasonable return now being enjoyed by the utility. Moreover, for the year 1956 the company expected to spend approximately four and a half million dollars on capital projects. And it conceded that inclusion of the additional $34,570 for the mains in question could have no material effect on its financial condition.
The examiner recommended that the Board refuse to order the extension of the mains at the expense of the company. The primary reasons for his action seem to be that a reasonable return would not be earned from the service, that the revenue to be derived at once would not suffice to meet operating costs, and that a cumulation of this and similar requests for extensions (although not yet made or even suggested or indicated) "could significantly increase the Company's rate base without providing adequate additional revenue."
After considering the record, the Board reached a contrary result. In doing so, it said:
*200 "The test of whether an extension is reasonable and practicable is not answered by a mere showing that such an extension would not be immediately profitable. While 32 [36 probably intended] residential customers have indicated a desire to use the water service, there are 60 houses in the area which are now being supplied by local wells. Further, there are large areas of ground that have not been developed, but the witness for the Company has testified that this area has been and is still growing. We feel that the future prospects in this area are very favorable and justify an order for the construction of the proposed extension and in the absence of a showing that the extension would result in reducing the overall revenue of the Company, so as to deprive it of a fair and reasonable rate of return, the construction of the extension is justified.
We find that the extension requested is reasonable and practicable, will furnish sufficient business to justify the original cost and upkeep and will not affect the financial condition of the Company * * *." (Insertion ours)
The company charges that the order which flowed from this decision violates the applicable rule of the Board promulgated in 1923 by which the obligation to extend water utility mains was regulated. This rule generally prescribes that where the cost of the proposed enlargement exceeds three and one-half times the estimated normal annual revenue from the residences involved and from the public agency for fire protection, the excess cost shall be deposited with the utility and shall remain, without interest, in the possession of the utility until such time as three and one-half times the revenue equals the cost of the extension. At that time the deposit must be returned pro rata to the depositor, subject to the proviso that after ten years any balance not yet returned becomes the property of the utility. Of course, the authority of the Board to act in the matter is regulated by N.J.S.A. 48:2-27, and to the extent that any rule contravenes the statute as interpreted, it has no validity.
The statute ordains:
"The board [of Public Utility Commissioners] may, after hearing, upon notice, by order in writing, require any public utility to * * * construct * * * any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension."
*201 Under this enactment, when the public convenience and necessity justify an extension of facilities, the fact that the utility will not realize a profit or an immediate profit from it is not dispositive of the matter. The criterion is the overall return. As was said in In re Township of Lakewood, supra, a franchise holder who alone serves an important and essential public need in a limited area cannot pick and choose its customers solely on the basis of pecuniary advantage and refuse to supply those who constitute an integral part of the locality simply because, considered in isolation, their consumption of the product will not produce a profit. The duty imposed on the utility so long as it holds the franchise is to serve such people.
This doctrine finds support in the cases cited in Lakewood and particularly in People of State of New York ex rel. New York & Queens Gas Co. v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337 (1917). In the latter opinion, the United States Supreme Court said:
"Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render. * * *." (245 U.S. at page 351, 38 S.Ct. at page 124.)
Accord: Atlantic City Sewerage Company, P.U.R. 1925 A, 135, 137 (1924). And it was also pointed out in McCall that "even if the return on the cost of complying with the order be conceded to be inadequate, this would not suffice to render the order legally unreasonable." Ibid. 245 U.S. at page 350, 38 S.Ct. at page 124. The effect on the overall return is the test.
Under the specific language of the Legislature, one factor to be considered is whether the financial condition of the company is such as "reasonably warrants the original expenditure required." No problem is presented on this score. As has been indicated, the existence here of such a financial state is beyond question. And it is not contended that the *202 failure to derive a return of 5.83% (the rate fixed in 1955 as representing a reasonable return on its total rate base) on the cost of the additional facilities will reduce the overall net operating income below the point of fair return.
Appellant contends that support for its opposition to the order is found elsewhere in the statute. And particular reference is made to the requirement that the proposed extension "will furnish sufficient business to justify" it. The contention is that the term "sufficient business" implies a condition that an extension cannot be imposed on a utility unless an immediate profit results from its use. In the absence of such a showing, it is urged, a demand upon the proposed users for a deposit (refundable under certain circumstances) to cover the construction cost may be made with legal propriety. In this connection we regard as significant the declaration of the court in Ridley Tp. v. Pennsylvania Public Utility Commission, 172 Pa. Super. 472, 94 A.2d 168, 171 (Super. Ct. 1953):
"Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. City of Altoona v. Pennsylvania P.U.C., 168 Pa. Super. 246, 77 A.2d 740. But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit. The action of the Commission must rest upon evidence which shows that, without the contribution or loan of the consumers, the cost of construction would materially handicap the utility in securing a fair return on all its operations. * * *." (Emphasis ours)
It must be assumed that our statute was drafted after due deliberation as to the language to be used. Obviously, if profit was intended to be a condition precedent to an order for expansion of facilities, the addition or substitution of a few words would have accomplished that result. So it may be said that the term "sufficient business" was advisedly employed in order to avoid establishing as the criterion profit *203 stemming solely from the new extension considered apart from the existing utility operations.
Thus we are brought to the necessity for definition of "sufficient business." In the light of the authorities cited, it must signify that a reasonable number of prospective users in a reasonably integrated or localized group within the franchise area and within reasonable distance of existing facilities are desirous of service, and that the public convenience and necessity require that such users be served. Amount of return, present or prospective, may enter into the exercise of the Board's discretion as to whether the group constitutes "sufficient business" but (the other conditions of the statute having been met) lack of profit or inadequacy of profit is important only as it affects the overall return of the utility. In re Township of Lakewood, supra, 29 N.J. Super. at pages 432, 433.
In the present situation, as has been outlined above, the facts adduced by appellant show that its services are being supplied in the territory immediately surrounding the locus in question and the map itself illustrates the short distance by which the mains are removed on three sides of the area. There is room for growth in the township, and it is growing. The section involved here is residential; 60 homes have been built there and the map reveals substantial space for further development. Although presently 36 home owners have agreed to take their water from the projected mains, it is only reasonable to suppose that others will take advantage of them. And it is not too much to expect that the improvement, with its attendant benefit of fire protection, will further stimulate the existing incentive for growth. But in any event we agree with the Board that under all of the circumstances, the requirement for sufficient business has been met.
A doctrine that would make immediate profit an unqualified condition precedent to an order for extension would be an uneconomic and unwise deterrent to community development. Likewise, it is inconsistent with the preferred and protected position the utility occupies by reason of its franchise. It *204 is common knowledge in utility regulation that occasionally a particular portion of the service rendered of itself produces inadequate revenue. Yet so long as the system in its entirety, operating within the franchised territory, produces a fair return, the unprofitable segment cannot be eliminated while it is required by the public convenience and necessity. Cf. Pennsylvania R. Co. v. Board of Public Utility Commissioners, 11 N.J. 43, 50, 51 (1952). As the Board noted in applying the statute in the earlier case of Middletown v. Monmouth Consolidated Water Co., 97 P.U.R., N.S., 501 (1953):
"The language of the statute [N.J.S.A. 48:2-27] does not contemplate that the public utility have the same return on each portion of its operation, only that the remainder of its operations not be jeopardized by requiring too great a burden on the utility."
So as the authorities referred to signify, when the requested extension is reasonable and practicable (as it is in this instance) and the public convenience and necessity will be served, the basic consideration is not immediate profit from its use. In fact, if the requirement for sufficient business, as defined above, is met, absence of any profit at all would not be dispositive. The other statutory prerequisites having been satisfied, if it appears that as the result of the extension the total revenue of the company would fail to produce a fair and reasonable return, the proper remedy is a revision of the rates unless it appears that the necessary increase would impose an unreasonable burden upon all of the consumers. People of State of New York, ex rel. Woodhaven Gaslight Co. v. Public Service Comm., 269 U.S. 244, 248, 249, 46 S.Ct. 83, 70 L.Ed. 255 (1925); Collingswood Sewerage Co. v. Borough of Collingswood, 91 N.J.L. 20, 28 (Sup. Ct. 1918), affirmed 92 N.J.L. 509 (E. & A. 1918).
At this point, comment upon the view expressed by the examiner seems relevant. His report suggests as a substantial ground for denying the present request that if a sufficient number of similar additional applications are made and granted, they "could significantly increase the *205 Company's rate base without providing adequate additional revenue." But there is neither need nor justification for considering any such hypothetical problem. Our concern is with the single issue now before us. In any event, when an extension is reasonable and practicable and warranted within the contemplation of the statute, the Board must be mindful of the obligation of public service which the utility has assumed. And if an increase of rates is thus made necessary, the Board, conscious that a fair and reasonable return for the utility is a matter of right and not one of grace, may be expected to act accordingly. N.J.S.A. 48:2-21; Collingswood Sewerage Co. v. Borough of Collingswood, supra.
The Collingswood case involved a petition to the Board for an increase in rates to be charged the users of a sewerage system. The charges sought to be revised had been fixed by the ordinance of the municipality which granted consent to the operation of the company. In discussing the jurisdiction and duty of the Board, the former Supreme Court said, among other things:
"It [the Board] found that extensions of the system for which numerous applications had been made were desirable, but that it was not reasonable and practicable for the company in its present financial condition to make them. It therefore declined to order them, and suggested municipal action which would make it possible for the company to obtain new capital. This amounted to turning over to the borough a duty which the statute imposes on the board. One of the objects meant to be secured was adequate and proper service for the public (not merely for those entitled to service with `present facilities') by order of the board, including reasonable extensions where they will permit sufficient business to justify construction and maintenance and when the financial condition of the public utility reasonably warrants the original expenditure required. The board, in effect and by inference, finds that the present service is not adequate, that extensions are reasonable and practicable, that the financial condition of the company could be made to justify the expenditures, and that new capital could be obtained for the purpose if the municipality would consent to a modification of rates. If this view is correct, the board should have ordered the necessary modification of rates, and not have shifted the responsibility to the municipality * * *." (91 N.J.L. at pages 28, 29.)
*206 The views we have expressed as to the validity of the Board's order require further consideration of sections 1(c) and 2 of the 1923 "General Rule Governing Extensions Made Upon Application of Individual Permanent Residents." As has been set forth above, these sections of the rule impose a general and unqualified obligation on a home owner applicant or group of such applicants for an extension of water mains to make a deposit with the utility in the circumstances detailed. Such a blanket fiat is violative of the letter and spirit of the statute. N.J.S.A. 48:2-27, as now interpreted and defined. The important consideration to be noted is that under the statutory language the ultimate decision rests in the discretion of the Board, subject to the conditions prescribed. Thus, each case must depend upon its own facts and circumstances, viewed in the light of the demands of the statute.
During the oral argument the operation of the "General Rule Governing Extension Requested by Land Development Agencies" was also discussed. This rule calls for deposit by the developer of the entire cost of extending the main lines into the newly developed tract. That rule is not pertinent to the present inquiry. But in passing it must be recognized that ordinarily a builder who plans to construct a number of new residences on a tract of land occupies a different status from that of a group of home owners already living in a locality and their fire district who seek a water supply. Cf. Reid Development Corp. v. Township of Parsippany-Troy Hills, 31 N.J. Super. 459, 464 (App. Div. 1954).
One further substantive matter calls for attention. Counsel for the Board informed us that the general rules relating to extensions are not considered applicable to public agencies, such as fire districts. And the impression conveyed was that a petition by a fire district for extension of mains would meet with automatic approval. It is true that the regulations do not specifically mention public bodies. However, section 1 (c) seems significant. It provides that the revenue to be received from a municipality for fire protection *207 shall be included when calculating the total anticipated income from the proposed extension for the purpose of determining whether a deposit would be ordered. This requirement militates against the indicated policy. Nevertheless, the important matter to be stressed is that such an unqualified policy would contravene the statute. When an application for extension of mains is made by a fire district, the right to a favorable order must be put to the test prescribed by the statute, just as in the case of a group of individual home owners. But in weighing the elements of reasonableness and practicability as well as those of public convenience and necessity, manifestly some additional probative force arises from the joinder of the fire district in the residents' petition. So in the case under discussion, the request should be considered as having been made by 37 prospective users, and some added persuasive influence given to the fact that a public agency charged with an important civic duty would be one of the consumers.
Examination of the memorandum of the Board demonstrates that the order was not predicated on the public agency factor. In fact, it is not even mentioned, although undoubtedly it was taken into consideration. The principal thrust of the opinion has to do with the present number of residential users who have agreed to buy the water, the number of homes in the locality, and the future prospects for the area. The entire record, and particularly the circumstance that for 22 years Fire District No. 3 has been pleading for a water supply for fire-fighting purposes, renders the conclusion inescapable that the Board decided the issue in the light of the requirements of the statute.
Finally, appellant argues that the action of the Board should be reversed because the recommendation of the examiner was overruled without notice and opportunity to be heard. Of course, there is no obligation to follow such a recommendation. The controlling procedural rule promulgated by the Board says:
"Under no circumstances will the report and recommendations of a hearing examiner become a final decision of the Board without *208 affirmative action of the Board. The Board, in reaching its final decision, shall consider the record and exhibits of the proceeding, together with the hearing examiner's report and recommendations, exceptions filed thereto, if any, and arguments and briefs in support thereof. The Board shall then either adopt, reject or modify the report and recommendations of the hearing examiner."
Provision is likewise made for the filing of exceptions to the report, in which event an opportunity for argument and briefing is given. Conference Order No. 26, §§ 7, 8. In this instance, the fire district was not represented by an attorney and no exceptions were filed. The Board then proceeded with its own study of the problem and ultimately issued the order under attack. Thereupon, appellant presented a petition for reargument and reconsideration in accordance with Conference Order No. 29. It was an elaborate petition reciting the factual and legal matters on which reargument was desired. Specific attention was directed to exhibits and to portions of the uncontradicted testimony (reference being made to the pages of the stenographic transcript of the hearing record), as well as to the statute involved and to the Lakewood case, around which the controversy seemed to center. Denial of the petition without granting an opportunity to be heard thereon is alleged to constitute error. We cannot agree.
The record reveals that the matters referred to in the formal application for reargument, including the statute and the Lakewood case, were argued before the examiner. The discussion appears in the transcript. No new elements were injected for consideration by the Board which were not already before it. Appellant's brief in this court concedes "[t]here was no dispute on the evidence." The legal problem to be ruled upon and the Company's position with respect to it were entirely clear. Under the circumstances, we perceive no prejudice flowing from the denial of the petition for reconsideration without further argument, oral or written. Cf. In re Masiello, 25 N.J. 590, 600, 601 (1958); Nordco, Inc. v. State, 43 N.J. Super. 277, 283-286 (App. Div. 1957).
The order of the Board is affirmed.
*209 BURLING, J. (dissenting).
The problem involved in this litigation is the extent to which a return on the investment of constructing and maintaining an extension of existent public utility facilities is a factor in ordering such extension at the utility's expense.
The problem is one of first impression before this court, and has not been raised in our courts prior to the recent case of In re Township of Lakewood, 29 N.J. Super. 422 (App. Div. 1954), rehearing denied sub nom. Lakewood Tp. v. Lakewood Water Co., 30 N.J. Super. 79 (App. Div. 1954). There the Appellate Division reversed an order of the Board of Public Utility Commissioners imposing conditions of cost upon applicants for extensions, where the particular proposed extension would result in a net operating loss. That decision was not further appealed. Thus, the Board in the instant case had no recourse but to follow the rule laid down in the Lakewood case and to reject the examiner's recommendation.
The rule expressed by the majority in this case is that utilities must bear the burden of extensions of service where "a reasonable number of prospective users in a reasonably integrated or localized group within the franchise area and within reasonable distance of existing facilities are desirous of service, and that the public convenience and necessity require that such users be served," regardless of the opportunity for a reasonable return upon its investment immediately or in the reasonably foreseeable future. The majority conclude that "lack of profit or inadequacy of profit is important only as it affects the overall return of the utility."
The source from which a solution to the problem must be ultimately found is the legislative standards set forth in R.S. 48:2-27 which provides:
"The board [of Public Utility Commissioners] may, after hearing, upon notice, by order in writing, require any public utility to * * * construct * * * any reasonable extension of its existing facilities where, in the judgment of the board, the extension is reasonable and practicable and will furnish sufficient business to justify the construction *210 and maintenance of the same and when the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension."
The statute requires that the judgment of the Board be predicated upon the existence of three conditions precedent which are connected with the conjunctive "and" before an extension is ordered. The Board must find (1) that the extension is reasonable and practicable; (2) that the extension will furnish sufficient business to justify its construction and maintenance and (3) that the financial condition of the public utility reasonably warrants the original expenditure required in making and operating the extension.
The condition relating to "sufficient business" clearly refers to the return from the particular proposed extension, as distinguished from the over-all financial structure of the utility (including over-all return) dealt with in the third condition. This follows from the fact that "sufficient business" modifies the phrase "to justify the construction and maintenance of the same," i.e., the particular extension.
Where a particular extension will not produce a reasonable return on the cost of construction and maintenance, either immediately or within the reasonably foreseeable future it can hardly be said that there exists "sufficient business" to justify it.
The Legislature has taken pains to spell out the criteria upon which judgment must be grounded. It is submitted that the factors expounded by the majority, i.e., reasonable number of prospective users, reasonably integrated or localized group within the franchise area, reasonable distance from existing facilities, relate only to the first condition; that the given extension be justified under the existent circumstances as reasonable and practicable. And the criterion of over-all return is clearly comprehended within the last condition, namely, that the financial condition of the public utility reasonably warrants the original expenditure in making and operating the extension. In effect the majority either write out of the statute or construe as being redundant the requirement that the extension will furnish sufficient business *211 to justify its construction and maintenance. This construction violates the long standing rule of construction that words inserted by the Legislature shall not be construed to be meaningless.
From a study of the statute, it is implicit that the term "sufficient business" was utilized by the Legislature to connote the fact that the return need not be immediate, but that the business prospects be such that a fair return will result in the reasonably foreseeable future.
Thus, the Board must find, before an order compelling extension of mains is issued, that within the reasonably foreseeable future a sufficient number of consumers will connect to the supply system, so that the total revenue derived from the extension will produce a reasonable return on the cost of its construction and maintenance. In this connection the number of existent potential customers in the proposed service area, the general rate of construction and development in the locality of the proposed service, and United States census figures showing population increases for the area are some of the relevant data upon which such an estimate may be based.
The probable return on the investment in the particular extension is universally a factor to be considered in ordering an extension. See Annotation, 58 A.L.R. 537 (1929); 43 Am. Jur., Public Utilities and Service, sec. 48. Whether it is dispositive must, of course, depend upon the legislative will, and where, as here, it is specifically included as one of three enumerated guiding criteria, all of which must be found to exist before an extension is ordered, neither the Board nor this court can set the policy at naught.
The cases cited by the majority are distinguishable. The case of Collingswood Sewerage Co. v. Borough of Collingswood, 91 N.J.L. 20 (Sup. Ct. 1918), affirmed 92 N.J.L. 509 (E. & A. 1918), is a rate case, posing a substantially different problem from the instant case. There the municipality had, by ordinance, established maximum rates to be charged by the sewerage company in exchange for its franchise. As a consequence the over-all return on the *212 capital investment was less than 3%. Upon application for an increase in rates, the Board of Public Utilities determined that it could not exercise its jurisdiction to order an increase in rates without violating the constitutional sanctions against impairing the obligation of contracts. But as a corollary matter, the Board also determined that, although otherwise desirable, it could not order extensions of existing facilities because of the inadequate over-all return of the company, i.e., condition 3 above referred to. In reversing the Board's determination the former Supreme Court held that the Board had both the jurisdiction and duty to order an increase in rates and at the same time, to order the extensions of service. There is no hint in the opinion that if the prevailing rates were increased, the extensions ordered would be operated at less than a fair return. In short, the condition relating to sufficient business was neither involved nor considered in the Collingswood case.
In Ridley Tp. v. Pennsylvania Public Utility Commission, 172 Pa. Super. 472, 94 A.2d 168 (Super. Ct. 1953), the Pennsylvania statute there construed is quite different from our own. As cited by the court, 94 A.2d at page 170:
"the Public Utility Code of May 28, 1937, P.L. 1053, § 401, 66 P.S. § 1171, clearly commands that `Every public utility * * * shall make all such * * * extensions * * * as shall be necessary or proper for the accommodation, convenience, and safety of its patrons * * * and the public.' (Emphasis added)"
The sole criterion set forth in the Pennsylvania statute is public convenience and necessity; it contains no language similar in import to "sufficient business" or "financial condition." And, as recently pointed out in Koplik v. C.P. Trucking Corp., 27 N.J. 1 (1958), "regardless of the views expressed in other jurisdictions, we must come back to our own statute for the ultimate decision."
The United States Supreme Court cases of People of State of New York ex rel. New York & Queens Gas Co. v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337 (1917), and People of State of New York ex rel. Woodhaven *213 Gaslight Co. v. Public Serv. Comm., 269 U.S. 244, 46 S.Ct. 83, 70 L.Ed. 255 (1925), did not involve problems of statutory construction. The issues urged were that the particular orders for extension of services in those cases violated due process, in that they were arbitrary, capricious or confiscatory. In each instance, the Supreme Court properly declined to rule on the reasonableness of the administrative action from a standpoint of state law. The problem of whether the state enabling legislation justifies a particular order and the problem of whether the order rendered violates the 14th Amendment to the United States Constitution are quite distinct.
It is equally significant that in each of the aforementioned cases the respective courts highlighted the foreseeable business prospects. Thus, in the Ridley case, supra, the court took judicial notice of the 1950 United States census figures which indicated that the population of the locale in question had increased 99% during the period from 1940 until 1950.
In the McCall case, supra, the United States Supreme Court held (245 U.S. at pages 350-351, 38 S.Ct. at page 124):
"These references to the evidence will suffice. They show this Public Service Commission ordering a public service corporation to render an important public service, under conditions such that in the aspect least favorable to the Gas Company the initial return upon the investment involved would be low but with every prospect of its soon becoming ample, and also that no claim was made by the company that the comparatively small loss which the company claims would result would render its business as a whole unprofitable." (Emphasis supplied)
And in the later Woodhaven case, supra, the court emphasized in 269 U.S. at page 247, 46 S.Ct. at page 84:
"In the territory already served by the company there are 150 consumers per mile of main. The sections for which service is ordered are residential communities. They have had water and electric service for many years. The houses already there, and those being built, are of a kind to indicate that, if brought within reach, gas will be used by the larger part of the inhabitants. There are good prospects of growth in the immediate future. The facts justify reasonable anticipation *214 of a substantial and increasing demand for gas in the territory to be reached by the extensions."
The plain meaning of the phrase "sufficient business to justify the construction and maintenance of the same" in the New Jersey statute leads to the conclusion that the intention was to compel extensions only where an adequate return upon the particular extension is a foreseeable probability within a reasonable time. It should be noted that there is an absence of persuasive constructional precedent indicating otherwise.
The standard set forth in the majority opinion contains inherent difficulties. Extensions comparable with the instant one, though individually representing a relatively small loss in comparison with the over-all return, may cumulatively have a substantial effect upon the total income of a utility. In answer the majority contends that the concern in this case "is with the single issue now before us" and "there is neither need nor justification for considering any such hypothetical problem." It is submitted that where, as here, the issue is one of statutory interpretation involving long range questions of policy, it is incumbent on the court to take into consideration the foreseeable consequences of a particular contended for interpretation. See 2 Sutherland, Statutory Construction, § 5905; Bayonne Textile Corp. v. American Federation of Silk Workers, 116 N.J. Eq. 146, 92 A.L.R. 1450 (E. & A. 1934). There is a suggestion in the majority opinion that a solution may be found in applications for rate increases. But rate hearings are time-consuming and tedious affairs, and repetitious applications for such rate increases are not practical as a solution to the problem. It is submitted that the Legislature did not intend that the utility company be obliged to resort to such a method to obtain its right to a fair and adequate return upon its investment.
Moreover, rate increases will, in effect, compel existent consumers to pay for extensions of service to others. The words of Chairman Gunnison of the New Hampshire Commission, *215 in In re Manley, (N.H.) P.U.R. 1925 C, 353, have not wilted or lost their force in the intervening 33 years:
"Thus, it will be seen that requiring a consumer to contribute toward the capital costs of furnishing service to him is an equitable adjustment of a common burden among the consumers. The controversy over the question of whether a consumer should contribute to the capital cost of furnishing him with service, is not in reality a matter between the utility and the consumers, but is rather a matter between the applicant for service and the consumers who are being served at a lower capital cost than it would cost to serve him.
The law entitled the utility to a revenue which will yield to it a fair return on the investment. The larger the investment, the larger must be the revenue, and necessarily, the higher will be the rates. It is, therefore, for the selfish interest of the utility to get as large an investment as the total yield from the business will warrant. But it is for the interest of the consumers to keep the capital investment as small as possible, in order that the rates for service may be as low as possible. When a utility declines to make extensions due to excessive capital costs involved, the unthinking public concludes that it does so in order that it can make more money, forgetting that the utility's income will be limited to a reasonable return. It wholly loses sight of the fact that what the utility is really doing is to protect its other consumers against the unreasonable demands of a prospective consumer." (at pp. 355-356) (Emphasis supplied)
What is needed in this area of the law is the translation of the general statutory standards into a fair, workable rule of thumb applicable to the general situation. Only in this manner can we hope to enhance the probability of the informal settlement of disputes between utility and consumer, thereby reducing the necessity for resort to the administrative and judicial processes.
"The General Rules Governing Extensions Made Upon Application of Individual Permanent Residents" recommending practices to be pursued affords such a constructive solution. These rules have been in existence since 1923, during which time utilities have operated under the recommended practice of charging consumers in the first instance for extensions into areas which must be serviced at a loss. And if, during a period of ten years the return from the extension resulted in a reasonable return, the original outlay was returned to the consumers.
*216 Presumably, the utility, if it could foresee within the reasonable future an adequate return, would not require the advancement or engage in litigation, but rather would voluntarily extend the service as a matter of good business practice and public relations.
The Board in 1923, in sponsoring the General Rules, recognized that they were not applicable to all situations. Thus, in an explanatory preface to the Rules, the Board declared:
"In view of the fact that the statute, section 17 (c) [currently R.S. 48:2-27] specifically authorized the Board to require extensions to be made under certain conditions, the Board is not of the opinion that these suggested rules and regulations should be imposed by order upon the companies, as under the law any individual customer or any utility may appeal to the Board for special treatment in cases which do not appear to be appropriate for determination under the general rules."
But this does not detract from the fact that the Board considered the Rules, as applied to the ordinary case, to be just and practicable with the least amount of complication. It is a testimonial to the workable nature of the previous policy, pursued in this jurisdiction for over 30 years, that the issue raised here did not come before the courts prior to 1954 in the Lakewood case.
I would uphold the general rules as being in harmony with the policy established in R.S. 48:2-27, while at the same time recognizing the right of any party in a particular instance to obtain review by the Board of the utility's decision of denial of unconditional extension, grounded upon the statutory criteria as interpreted in this opinion.
Accordingly, for the reasons set forth in this opinion, I dissent and vote to reverse the order from which the appeal has been taken and remand the cause to the Board of Public Utility Commissioners for a specific finding on the question of whether an adequate return upon the proposed extension is a foreseeable probability within a reasonable time.
WACHENFELD, J., joins in this dissent.
*217 For affirmance  Chief Justice WEINTRAUB, and Justices HEHER, JACOBS, FRANCIS and PROCTOR  5.
For reversal  Justices WACHENFELD and BURLING  2.