GOLDEN NUGGET ATLANTIC CITY CORPORATION, PETITIONER–APPELLANT, v. ATLANTIC CITY ELECTRIC COMPANY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 12, 1988—Decided December 5, 1988.

Before Judges ANTELL, HAVEY and BROCHIN.

*Clark E. Alpert* argued the cause for appellant Golden Nugget (*Greenberg, Margolis, Ziegler, Schwartz, Dratch,*

*Fishman, Franzblau & Falkin,* attorneys; *Martin L. Greenberg* and *Clark E. Alpert,* of counsel; *Steven Pasternak* and *Clark E. Alpert,* on the brief).

*Jon R. Mostel* argued the cause for respondent Atlantic City Electric Co. (*LeBoeuf, Lamb, Leiby & MacRae,* attorneys; *William R. Holzapfel, Jeffrey W. Meyers* and *Jon R. Mostel,* of counsel; *Jeffrey W. Myers, Jon R. Mostel* and *Bert H. Ware,* on the brief).

*Susan J. Vercheak,* Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Susan J. Vercheak,* on the brief).

The opinion of the court was delivered by

ANTELL, P.J.A.D.

Hilton New Jersey Corporation (Hilton) and Golden Nugget Atlantic City Corporation (GNAC) petitioned the Board of Public Utilities (BPU) to require Atlantic City Electric Company (ACE) to extend its electric transmission lines to serve their new casino/hotel projects in the Atlantic City Marina area. The history of those petitions and their attending circumstances are detailed in *Hilton New Jersey Corp. v. Atlantic City Elec. Co.,* 205 *N.J.Super.* 217 (App.Div.1985), in which we considered the appeals of Hilton and GNAC from BPU's determination that petitioners must pay the cost of the extensions.

The petitions had been filed under *N.J.S.A.* 48:2–27. This statute requires BPU to order the extension of utility service where the extension is reasonable and practicable, where it will

furnish sufficient business to justify the extension and where the financial condition of the utility reasonably warrants the expenditure involved in making and operating the extension. In our earlier opinion we found that "the reasonableness and practicability of the extension and the capacity of ACE to finance it are undisputed." *Id.* at 221. However, to determine whether the extension would furnish sufficient business to justify its construction and maintenance at the sole expense of ACE we remanded to BPU for further proceedings. In so doing we stated the following:

> We direct that BPU apply *N.J.S.A.* 48:2–27 in favor of Hilton and GNAC if it reaches a fact finding that the cost of the line extension would be recovered out of revenues generated from Hilton and GNAC within what BPU determines to be a reasonable period of time. The experience of the intervening year between the order on appeal and this opinion may be drawn upon. [*Id.* at 224.]

Following our remand, BPU referred the matter to the Office of Administrative Law (OAL) for a hearing. The record of that proceeding was closed May 5, 1987, and on June 15, 1987, the Administrative Law Judge (ALJ) filed her initial decision which, after some discussion, was adopted by BPU on August 4, 1987. Pursuant thereto, BPU decided that three years is a reasonable cost recovery period within the meaning of our directive. Since, for reasons to be stated, there is no prospect of revenue to the utility from use of the transmission extension to GNAC, GNAC's application for return of the $658,530, which it had paid to ACE to meet the cost of installing the extension as the work progressed, was denied. GNAC appeals.

The circumstances of the case have materially changed since our last decision. After Hilton was denied licensure by the Casino Control Commission it transferred its facilities to Trump's Castle Associates, t/a Trump's Castle Hotel and Casino, an entity which is referred to hereinafter as Hilton–Trump's Castle (H–TC). H–TC is in active operation, and, on September

12, 1986, it entered into a BPU-approved settlement stipulation with ACE. In April 1984 GNAC decided not to proceed with its plan to construct a casino on the marina site. However, it continued site preparation, including electric facility construction and bulkheading, so that if it later reversed its decision and determined to construct a casino in the future this option would remain open. It did not tell ACE of its change in plans, however, until September 13, 1984.

On this appeal GNAC challenges the BPU determination that separate transmission extensions were installed for GNAC and H–TC. It contends that only a single line was constructed to serve the entire area occupied by the two casinos, and under the reasoning of *In re Bd. of Commrs., Fire Dist. No. 3, Piscataway Tp.*, 27 *N.J.* 192 (1958) and *In re Tp. of Lakewood*, 29 *N.J.Super.* 422 (App.Div.1954), rearg. den. 30 *N.J.Super.* 79 (App.Div.1954), the cost of the extension should be borne by ACE. It reasons that the "massive revenues" being produced by H–TC provide the necessary assurance that the cost of constructing the extension will be returned to the utility within the three years designated by BPU as a reasonable cost recovery period.

Our role as an appellate court sitting in review of administrative determinations is to determine " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965) (*quoting State v. Johnson*, 42 *N.J.* 146, 162 (1964)). *See also Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85, 92–93 (1973). We may not substitute our judgment for that of the agency. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544,

562–563 (1978). These limitations on our authority are particularly applicable where the administrative agency's technical expertise is a factor in its determination. *Morris Cty. v. Skokowski*, 86 *N.J.* 419, 424 (1981); *IFA Ins. Co. v. New Jersey Dept. of Ins.*, 195 *N.J.Super.* 200, 208 (App.Div.1984), certif. den. 99 *N.J.* 218 (1984); *New Jersey Bell Telephone Company v. State*, 162 *N.J.Super.* 60, 77 (App.Div.1978).

The finding that two separate extensions were installed to service the separate facilities is supported by the evidence and the technical expertise of the agency. Although a single conduit, or duct bank, was placed in the ground, it contains two separate cables, one to service H–TC, the other GNAC. The ALJ specifically determined that "[t]he extensions built for H–TC, which requested more capacity, are clearly distinguishable from those required by GNAC." As she found, "GNAC has not become a customer, has produced no revenues as of the hearing dates in March 1987, and neither GNAC nor any other party has firm plans to commence construction of any facility which would take service on the GNAC site." Thus, she concluded, the cables which were installed for GNAC's use could not be treated as "used and useful" in the public service and would therefore be ineligible for inclusion as part of ACE's rate base for purposes of determining its rate of return. *See In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 22 (1974); *Public Service Coordinated Transport v. State*, 5 *N.J.* 196, 217 (1950).

The conduit, as we have noted, is a single tube carrying the cables of both GNAC and H–TC. As to this, GNAC was assessed a pro-rata share of its cost. We find no error in this determination, particularly in light of BPU's finding that the cost of running a single conduit to serve both facilities was

calculated to result in a lower cost to GNAC than if separate conduits were to be installed for each. Although GNAC had decided as early as April 1984 not to proceed with the casino project, it did not advise ACE of its change in plans for nearly five months. As BPU found, had ACE known sooner that it would not be extending its service to the GNAC property, ACE would have proceeded with an installation scheme substantially less expensive to the utility than the one which was actually utilized to the cost advantage of GNAC.

Historically, in cases arising under *N.J.S.A.* 48:2–27, the search has been for "a solution which equitably protects the substantial financial interests" of utilities, developers and property purchasers in affected areas. Thomas, "Public Utilities: Extension of Service," 16 *Rutgers L.Rev.* 318, 318 (1962). As the Supreme Court observed in *Piscataway, supra,* 27 *N.J.* at 206: "[E]ach case must depend upon its own facts and circumstances viewed in the light of the demands of the statute." Here, we find applicable the equitable maxim that equity does not aid one whose indifference contributes materially to the injury of which he complains. *Harrington v. Heder,* 109 *N.J.Eq.* 528, 534 (E. & A.1931); *Moro v. Pulone,* 140 *N.J.Eq.* 25, 30 (Chancery 1947); *Herder v. Garman,* 106 *N.J.Eq.* 13, 14 (Chancery 1930). In our view, GNAC's five-month silence about its planned abandonment of the casino project while ACE, anticipating that the project would continue, was proceeding with the installation is an equity which weighs decisively against GNAC's claim that it should not be obliged to pay for its pro-rata share of the duct bank.

GNAC's contention that our previous opinion in this matter expressly found a single extension and not two is incorrect. The question of whether one or two extensions were involved was in no sense material to the issues then before us, and

although the opinion makes frequent reference to an "extension," this does not imply a studied intent to use the singular. Indeed, we note that in the first paragraph of our opinion we refer to the extension of ACE transmission "lines."

GNAC also contends it is entitled to prevail in view of the fact that sufficient revenues to cover the cost of the project have already been generated by H–TC alone. It relies for this proposition on that part of our earlier opinion which instructs BPU to find in favor of "Hilton and GNAC if it reaches a fact finding that the cost of the line extension would be recovered out of revenues generated from *Hilton* and *GNAC* within what BPU determines to be a reasonable period of time." *Hilton, supra,* 205 *N.J.Super.* at 224 (emphasis supplied). The record of the proceeding then before us was closed by the OAL on February 14, 1984. Although our opinion was written in November 1985, we had no knowledge that GNAC had set aside its planned development of the property in April 1984, but failed to notify ACE of this until September of that year. Had we known this at the time, we would have taken pains to specify that each petition was to be separately decided based upon the revenues anticipated from each petitioner.

GNAC argues that BPU arbitrarily disregarded GNAC's uncontested evidence that ten years is a reasonable time frame for cost recovery purposes. Reliance for its argument is placed upon *Phila. Outdoor v. N.J. Exp. Auth.,* 221 *N.J.Super.* 207 (App.Div.1987), where we found that the agency's findings were not based on sufficient credible evidence. The issue there involved a misinterpretation by the agency of the appropriate legal standard governing the erection of an outdoor advertising sign. Here we are not concerned with the interpretation given to a fixed legal standard. We deal instead with the validity of a determination, confided to the expertise of BPU, as to a reasonable cost recovery period for the purpose of ascertaining whether sufficient business would be generated from a transmission

extension project so as to justify its construction and maintenance by the utility.

In our view, BPU was at liberty to draw upon its own expertise for an answer to this question. "Findings may be based on an agency's expertise, without supporting evidence, and findings resting on an agency's expertise may be especially important to the judicial review process when the court does not share the agency's expertise." 3 *Davis, Administrative Law* § 14:28 at 126 (2d Ed.1980). This is especially true of determinations which, as here, are "primarily of a judgmental or predictive nature." *FCC v. Nat. Cit. Comm. for Broadcasting*, 436 *U.S.* 775, 813, 98 *S.Ct.* 2096, 2121, 56 *L.Ed.*2d 697, 726 (1978).

In *F.P.C. v. Transcontinental Gas Corp.*, 365 *U.S.* 1, 29, 81 *S.Ct.* 435, 450, 5 *L.Ed.*2d 377, 395 (1961), the Supreme Court rejected in the following way a contention that the Federal Power Commission should have received supporting testimonial and documentary evidence before predicting the course of future gas price increases:

> However, we do not think the Commission is so limited in its formulation of policy considerations. Rather, we think that a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.

In rendering their conclusions the ALJ and BPU took into account BPU policy and regulations on extensions of service, prior and current policies of ACE on extension of services, the actual experience of H–TC and the magnitude of the risk associated with the heavy loads and expensive facilities required to serve casinos. We find no error in BPU's determination.

Moreover, the entire question is made largely academic by the fact that the property is still vacant and no plans have been formulated for its future development. Our previous decision mandated a determination in favor of GNAC only if BPU found that the cost of the extensions would be recovered out of

revenues generated from GNAC within what BPU determined to be a reasonable time. Here, BPU found that if GNAC had generated the revenues it originally estimated, it would have liquidated its obligation within two years. But under the present circumstances, there are no plans which would result in the generation of any revenue in the near or distant future and thus no basis for making the necessary estimates. What GNAC is asking is that ACE "take a speculative stake in the success of [GNAC's] development of the area, without any reasonable assurance as to the amount of return it will receive for its investment or when, if ever, such a return will be realized." *Langan v. West Keansburg Water Co.*, 51 *N.J.Super.* 41, 52 (App.Div.1958), certif. den. 28 *N.J.* 56 (1958). To require a utility to accept such a risk would seriously threaten its financial ability to provide utility service which is "safe, adequate and proper," *N.J.S.A.* 48:2–23, and is therefore indefensible.

In view of our determination to affirm BPU's denial of GNAC's application for return of its deposit, we find no merit in GNAC's request for payment of the difference between interest on the $658,530 deposited and the premium it would have paid on a performance bond. The monies advanced were used to pay the cost of construction. Had a bond been posted, ACE's cash advances would have been recoverable by the utility with interest.

Also lacking in merit are GNAC's claims of bias and unfairness in the OAL proceeding. *R.* 2:11–3(e)(1)(E).

The determination under review is supported by sufficient credible evidence in the record, giving due regard to the agency's opportunity to judge the credibility of witnesses and its technical expertise. *Mayflower Securities v. Bureau of Securities, supra,* 64 *N.J.* at 92–93; *Close v. Kordulak Bros., supra,* 44 *N.J.* at 599.

AFFIRMED.